[No. A046968. First Dist., Div. One. Mar. 20, 1991.]

THE PEOPLE, Plaintiff and Respondent, v.
DONALD L. HARPER, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

---

\*Pursuant to California Rules of Court, rules 976 and 976.1, this opinion is certified for publication with the exception of parts III and IV.

COUNSEL

George L. Schraer, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Richard B. Iglehart, Chief Assistant Attorney General, John H. Sugiyama, Assistant Attorney General, Ronald E. Niver and Bruce Ortega, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

STEIN, J.—Donald L. Harper appeals from his conviction, following a jury trial, of first degree murder with use of a firearm (count one), preventing and dissuading a witness by means of force or threats (count four), and two counts of inducing a witness to give false testimony by force or fear (counts three and five).

FACTS

*The Murder*

On February 5, 1988, Tyrone Pouncy was killed on a stair landing of the Page and Webster Street Housing Projects. Pouncy had been shot at least six times with .25-caliber bullets and five times with .38-caliber bullets.

Initially, the police were unable to locate any persons who would admit to having witnessed the shooting. On February 22, however, an investigating officer, Officer Gerrans, received a tip that Trudy Clausen had been standing outside the door of the apartment when the shooting occurred and must have been a witness. Clausen told Gerrans that she had walked up the stairs with Pouncy, had entered an apartment, and that a short time later she had heard at least six shots. She went outside and saw Pouncy's body but did not see the shooting. Gerrans saw Clausen again in late March, at which time she admitted that she had seen the shooting but, stating that she was afraid for her safety and for the safety of her children, asked that Gerrans give her a week or so to think about it before telling him anything more.

On April 7, the police received a telephone call from a woman who identified herself as Patricia Jones. "She said she was the ex-girlfriend of Donald Harper. She gave the names of Eric Broussard and Donald Harper, gave a description of Donald Harper, gave an address of 237 Scott Street. Said they were—said they were involved, those two in the shooting in the Page Street Projects . . . . After Donald Harper shot him, Eric Broussard finished him off." The telephone call in fact was made by Harper's cousin, Belinda Sessions. Harper had told Sessions that he shot Pouncy six times in the head. "He say the guy looked like he was going for a gun, and he just snuck behind him and shot him." The reported motive was that Pouncy had robbed Harper's friend Eric the night before, and just before Harper snuck up behind Pouncy, "He [Pouncy] was fussing at Eric about something."

On April 14, Officer Gerrans recontacted Clausen who made a taped statement and identified a photograph of Harper as being the person who shot Pouncy. Clausen testified that she was slightly acquainted with Pouncy. She again related that they had walked together up the stairs of the Page Street Projects. It turned out that they both were going to the same apartment; however, the people inside the apartment would not let them in. As they began to walk away, Clausen stopped to talk to a man. She heard two shots and turned around. Harper, whom Clausen recognized and considered to be her friend, was holding a gun. She saw two more shots fired and saw Pouncy fall.

Gerrans visited Jones, asking about the telephone statement made in Jones's name by Sessions. Jones made a taped statement to the police and testified that Harper had told her he shot Pouncy. "He told me it was drug related. The boy had owed him approximately an amount of $400 and he didn't have the money."

*Threats Against Clausen*

Approximately two weeks after the shooting, Clausen ran into Harper at a party. Clausen believed that people had been telling Harper not to trust

her, so she told him that she didn't want to get involved and that he had nothing to worry about. "He said, yeah, something to the effect of: You know, you get just the same amount of time for one—for two murders as you get for one. . . . I said: Yeah, I know that . . . . But I'm not going to say anything." He said "I was the only one that can take his freedom from him. I was the only one—I was the only one he was leery of at the time. He knew I saw him."

Clausen also testified that after Harper's arrest, she was arrested for petty theft with a prior, and was incarcerated at the same facility which housed Harper. Once, as she walked where she could see and be seen by Harper, he drew his finger across his neck and mouthed the words, "Bitch, you told. Your ass is out."

## I.

### *Harper's Wheeler/Batson Motion Was Properly Denied*

In *People* v. *Wheeler* (1978) 22 Cal.3d 258 [148 Cal.Rptr. 890, 583 P.2d 748], the California Supreme Court held that peremptory challenges may not be used to remove prospective jurors solely on the grounds of presumed group bias, i.e., on the grounds that they are members of an identifiable group distinguished on racial, religious, ethnic, or similar grounds. (*Id*. at pp. 276-277; see also *People* v. *Johnson* (1989) 47 Cal.3d 1194, 1215 [255 Cal.Rptr. 569, 767 P.2d 1047].) The United States Supreme Court reached a similar conclusion in *Batson* v. *Kentucky* (1986) 476 U.S. 79, 97 [90 L.Ed.2d 69, 88, 106 S.Ct. 1712].) "Under *Wheeler* and *Batson*, if a party believes his opponent is improperly using peremptory challenges for a discriminatory purpose, he must raise a timely challenge and make a prima facie case of such discrimination. Once a prima facie case has been shown, the burden shifts to the other party to come forward with an explanation that demonstrates a neutral explanation related to the particular case to be tried." (*Johnson, supra*, 47 Cal.3d at p. 1216.)

In the present case the prosecution exercised a peremptory challenge against Doretha Cross, apparently the sole Black juror then impaneled. Defense counsel attacked the challenge and moved to excuse the entire panel on the grounds that the challenge had been based on presumed group bias. The court, impliedly finding that a prima facie case of discrimination had been made (see *People* v. *Turner* (1986) 42 Cal.3d 711, 718-719 [230 Cal.Rptr. 656, 726 P.2d 102]), required the prosecutor to state his reasons

for challenging Cross. The court permitted defense counsel to respond to the stated reasons and heard the prosecutor's further explanation. The court thereafter denied Harper's motion. ■ Harper, arguing that the prosecutor failed to give an adequate reason for the challenge, claims error.

Until the recent decision in *People* v. *Johnson, supra,* 47 Cal.3d 1194, a court reviewing the denial of a *Wheeler* motion arguably was required to independently determine if the prosecution made challenges for an improper purpose. (*People* v. *Trevino* (1985) 39 Cal.3d 667, 688-693 [217 Cal.Rptr. 652, 704 P.2d 719].) The court in *Johnson,* however, disapproved *Trevino,* finding that reviewing courts should give great deference to trial courts in distinguishing bona fide reasons for exercising a challenge from sham excuses. Noting, among other things, that a prospective juror's body language and mode of answering questions are relevant to the question of whether a prima facie case has been rebutted (*Johnson, supra,* at p. 1219), the court held at page 1221, "It should be apparent . . . that the very dynamics of the jury selection process make it difficult, if not impossible, on a cold record, to evaluate or compare the peremptory challenge of one juror with the retention of another juror which on paper appears to be substantially similar . . . . Here an experienced trial judge saw and heard the entire voir dire proceedings by which defendant's jury was selected. The record indicates he was aware of his duty under *Wheeler* to be sensitive to the manner in which peremptory challenges were used. He found no improper use of peremptory challenges by the prosecutor. Under these circumstances we see no good reason to second-guess his factual determination."

Here, the court, like the trial court in *Johnson,* was aware of its duty to investigate the reason for the challenge. The court did not "rubber-stamp" the prosecution's decision, nor can we say as a matter of law that the prosecutor stated sham reasons for its challenges.[1] The court ruled only

---

[1] The relevant proceedings follow:

"MR. HARTMANN: There were—there was a combination of reasons why I challenged Ms. Cross. One, is that she stated that she was familiar with the Waterloo Club. The Waterloo Club is going to be central to the defendant's alibi.

". . . I don't want anybody who knows anything about that club on the jury.

"Number two, she stated that she worked on—at the Post Office around Evans around that area. When I talked to—she also stated that she had—she didn't raise her hand when I asked if anyone had ever seen drug users or drug sales. When I talked to my inspector and asked him I thought that whole area around there are pretty obvious there are drug sales going on, he said yes there are, and he told me that he didn't believe that she—he said either she's not telling the truth or she is really naive. Either way, I don't want her on the jury.

"Number three, combined with those two, and I should say that her—that the naive part I think is also buttress [*sic*] by my just watching her facial expressions and how she reacted

after conducting a full hearing and listening to the arguments of defense counsel: "The test is not whether I would have done the same thing if I were litigating this case, and, by the way, I would not, but whether I accept your explanation as truthful and conclude that your explanation has satisfied me that you acted in good faith and not for racial exclusion reasons, and I do so find." The present situation is not one requiring interference with the trial court's ruling.

## II.

### Use in Rebuttal of a Statement Taken From Harper in Violation of the Sixth Amendment

Harper contradicted Clausen's statement that he had threatened her at the party, stating that he did not have any conversation with her at all. He further denied that he said or did anything threatening when he saw her while in custody. The prosecution was permitted to rebut Harper's testimony with a statement made to Officer Glen Noland who worked at the correctional facility.

When Inspector Gerrans personally delivered a subpoena to Clausen, she expressed reservations about testifying. She said that on October 4, 1988, appellant had threatened her in jail where appellant was in custody. Gerrans informed the prosecutor, who moved to amend the complaint to add this threat. Shortly thereafter Gerrans informed Sergeant Noland of appellant's threats. Noland, as head of the jail's classification unit, went to talk with appellant for "administrative segregation" purposes. Noland did not advise appellant of his rights per *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974], and "used an interview technique where I just went up to him and confronted him point blank, you know, hey this is kind of dumb, you're fighting a homicide case, this is a very serious issue and you are going to threaten witnesses, this is going to

during the whole time, she was incredibly I guess the word I would use is very, very placid. She didn't show really any emotions throughout the whole thing.

"I get the feeling that she is a very naive person. I don't want to think she is lying about not seeing anything. I think she is naive.

"Last thing she is a young married—married to I assume of a person around the same age. Her husband is unemployed. And in this case the testimony was that the defendant was unemployed. I don't like the idea of any young lady, and I think as far as I know she is the only one of the jury who is a young lady who has an unemployed husband, because she may sympathize with the defendant.

"That's not the major reason. The major reasons I gave you were the ones I have stated. And I do think that that that [sic] is appropriate, that it was not racially motivated, and indeed I will state that I plan now on excusing other persons as well.

"And Ms. Jones I would last point out who is also a Black woman juror has taken the place of Miss Cross. And I would point out to the court that I don't plan to challenge her, for example." (Ms. Jones in fact did remain on the jury.)

adversely effect [*sic*] your ability to defend yourself; I took that approach with him and [appellant] ultimately admitted that he had made threatening—certain threats to her. He didn't specify exactly what or how he made the threats."

■ Harper did not, and does not, argue that his statement was involuntary. Rather, he argues that Noland's interview violated his Sixth Amendment rights as defined by the court in *Massiah* v. *United States* (1964) 377 U.S. 201 [12 L.Ed.2d 246, 84 S.Ct. 1199]. " 'Any secret interrogation of the defendant, from and after the finding of the indictment, without the protection afforded by the presence of counsel, contravenes the basic dictates of fairness in the conduct of criminal causes and the fundamental rights of persons charged with crime.' " (*Id.* at p. 205 [12 L.Ed.2d at p. 250].) "We hold that the petitioner was denied the basic protections of that [Sixth Amendment] guarantee when there was used against him at his trial evidence of his own incriminating words, which federal agents had deliberately elicited from him after he had been indicted and in the absence of his counsel." (*Id.* at p. 206 [12 L.Ed.2d at p. 250].)

The Attorney General all but concedes that the interrogation occurred in violation of *Massiah*. It is argued, however, that under the recent case of *Michigan* v. *Harvey* (1990) 494 U.S. 344 [108 L.Ed.2d 293, 110 S.Ct. 1176], Harper's statement nonetheless could be used against him for impeachment purposes—an argument which appears to be of first impression. We are of the opinion that the Attorney General's reading of *Harvey* is overbroad.

The court in *Harvey* analyzed the opinion in *Michigan* v. *Jackson* (1986) 475 U.S. 625 [89 L.Ed.2d 631, 106 S.Ct. 1404]: "In *Michigan* v. *Jackson* . . . the Court created a bright-line rule for deciding whether an accused who has 'asserted' his Sixth Amendment right to counsel has subsequently waived that right. . . . [T]o help guarantee that waivers are truly voluntary, *Jackson* established a presumption which renders invalid some waivers that would be considered voluntary, knowing, and intelligent under the traditional case-by-case inquiry." (*Michigan* v. *Harvey, supra*, 494 U.S. at pp. __ [108 L.Ed.2d at p. 301]) The *Harvey* court described the bright-line rule as a "prophylactic rule that once a criminal defendant invokes his Sixth Amendment right to counsel, a subsequent waiver of that right—even if voluntary, knowing, and intelligent under traditional standards—is presumed invalid if secured pursuant to police-initiated conversation." (*Id.* at p. __ [108 L.Ed.2d at p. 299].) The court then stated that in creating that prophylactic rule, *Jackson* had simply "superimposed the Fifth Amend-

ment analysis of *Edwards*[2] onto the Sixth Amendment." (*Id*. at p. __ [108 L.Ed.2d at p. 302].)

Noting that it had already decided that "although statements taken in violation of *only the prophylactic Miranda rules* may not be used in the prosecution's case-in-chief, they are admissible to impeach conflicting testimony by the defendant" (*Michigan* v. *Harvey, supra*, at p. __ [108 L.Ed.2d at p. 302], italics added), the court held, "[t]here is no reason for a different result . . . where the *prophylactic rule* is designed to ensure voluntary, knowing, and intelligent waivers of the Sixth Amendment right to counsel rather than the Fifth Amendment privilege against self-incrimination or 'right to counsel.'" (*Id*. at p. __ [108 L.Ed.2d at p. 303], italics added.) The *Harvey* court, accordingly, found that where a defendant made a statement after knowingly and voluntarily waiving his right to counsel, the statement could be used for impeachment purposes, and remanded the matter for a determination of whether the defendant's waiver of his right to counsel was "knowing and voluntary." (*Id*. at p. __ [108 L.Ed.2d at p. 303].)

Thus, the *Harvey* court held that a statement taken in violation of "only a prophylactic rule" may be used for impeachment purposes. It does not, however, follow that a statement taken in violation of the Constitution may be used for impeachment purposes. A brief analysis of Fifth Amendment case law is illuminating.

The Fifth Amendment provides that no person "shall be compelled in any criminal case to be a witness against himself." In *Miranda* v. *Arizona, supra*, 384 U.S. 436, the court established a procedure for protecting this right. Before a defendant may be subjected to a custodial interrogation, he or she "must first be informed in clear and unequivocal terms that he has the right to remain silent." (*Id*. at pp. 467-468 [16 L.Ed.2d at p. 720].) "The warning of the right to remain silent must be accompanied by the explanation that anything said can and will be used against the individual in court." (*Id*. at p. 469 [16 L.Ed.2d at p. 721].) Further, "an individual held for interrogation must be clearly informed that he has the right to consult with a lawyer and to have the lawyer with him during interrogation." (*Id*. at p. 471 [16 L.Ed.2d at p. 722].) The court in *Miranda* also held that the outlined procedure is a prerequisite to the admission of a defendant's state-

[2] In *Edwards* v. *Arizona* (1981) 451 U.S. 477, 484-485 [68 L.Ed.2d 378, 385-387, 101 S.Ct. 1880], it was held that where an accused person in custody has "expressed his desire to deal with the police only through counsel, [that person] is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." The court further held that any statement taken in violation of this procedure could not be used against the defendant. (*Id*. at p. 485 [68 L.Ed.2d at p. 386].)

ment. The court in *Miranda*, therefore, held that evidence would be suppressed where it was obtained in violation of the outlined procedure, whether or not it was obtained in violation of the Fifth Amendment. The distinction was recognized by the court in *New Jersey v. Portash* (1979) 440 U.S. 450 [59 L.Ed.2d 501, 99 S.Ct. 1292] where the statement at issue violated *Miranda* and, because it was involuntarily taken, also violated the Fifth Amendment. The prosecution, citing *Harris v. New York* (1971) 401 U.S. 222 [28 L.Ed.2d 1, 91 S.Ct. 643] and *Oregon v. Hass* (1975) 420 U.S. 714 [43 L.Ed.2d 570, 95 S.Ct. 1215], had argued that the statement could be used for impeachment purposes. The Supreme Court rejected the argument, finding that the rule stated in *Harris* and *Hass* applied only where the prophylactic *Miranda* right—as opposed to the Fifth Amendment right—was at issue. (*New Jersey v. Portash, supra*, 440 U.S. at pp. 458-459 [59 L.Ed.2d at pp. 509-510].)

The court in *Michigan v. Harvey, supra*, 494 U.S. 344, also recognized this distinction, noting that "*Miranda*, of course, required police interrogators to advise criminal suspects of their rights under the Fifth and Fourteenth Amendments and set forth a now-familiar set of suggested instructions for that purpose. Although recognizing that the *Miranda* rules would result in the exclusion of some voluntary and reliable statements, the Court imposed these 'prophylactic standards' on the States [citation] to safeguard the Fifth Amendment privilege against self-incrimination. *Edwards v. Arizona* added a second layer of protection to the *Miranda* rules . . . *Edwards* thus established another prophylactic rule designed to prevent police from badgering a defendant into waiving his previously asserted *Miranda* rights." (*Id*. at p. __ [108 L.Ed.2d at p. 303].)

As noted, the *Harvey* court found that *Michigan v. Jackson*, like *Miranda* and *Edwards*, established a prophylactic rule: a defendant's waiver of his Sixth Amendment right to counsel is presumed invalid if he has once invoked it, and any statement taken after such a presumptively invalid waiver may not be used against him. The prophylactic rule, however, has little application here where there is no question of waiver. The statement, taken after appellant was indicted, and without any waiver of his right to counsel, simply and unequivocally violated the Sixth Amendment. "[A] Constitution which guarantees a defendant the aid of counsel at such a trial [in an orderly courtroom, presided over by a judge, open to the public, and protected by all the procedural safeguards of the law] could surely vouchsafe no less to an indicted defendant under interrogation by the police in a completely extrajudicial proceeding. Anything less . . . might deny a defendant 'effective representation by counsel at the only stage when legal aid and advice would help him.' " (*Massiah v. United States, supra*, 377 U.S. at p. 204 [12 L.Ed.2d at p. 249], citing concurring opinions in *Spano v. New*

*York* (1959) 360 U.S. 315, 326-327 [3 L.Ed.2d 1265, 1273-1274, 79 S.Ct. 1202].) The use of the statement is not barred by the prophylactic rule of *Michigan* v. *Jackson*, but by the law holding inadmissible statements taken in violation of the Constitution. "Balancing of interests was thought to be necessary in *Harris* and *Hass* [permitting use of a defendant's statements for impeachment purposes]. Here, by contrast, we deal with the constitutional privilege . . . in its most pristine form. Balancing, therefore, is not simply unnecessary. It is impermissible." (*New Jersey* v. *Portash, supra,* 440 U.S. at p. 459 [59 L.Ed.2d at p. 510].)[3]

The Attorney General, citing to the statement in *Harvey* that "we need not consider the admissibility for impeachment purposes of a voluntary statement obtained in the absence of a knowing and voluntary waiver of the right to counsel" (*Michigan* v. *Harvey, supra,* 494 U.S. at p. __ [108 L.Ed.2d at p. 305]), argues that "there is no reason to treat statements taken where a waiver of counsel is presumed invalid (*Harvey*) differently than voluntary statements taken where no waiver of counsel occurred (this case)." The distinction, as discussed, is that the former situation violates only a prophylactic rule (*Michigan* v. *Jackson, supra,* 475 U.S. 625 [89 L.Ed.2d 631], while the latter violates the Sixth Amendment. The Attorney General would have the relevant distinction be between "voluntariness" and "involuntariness," noting that in such cases as *Harris* v. *New York* and *Oregon* v. *Hass*, the courts found that voluntary statements could be used for impeachment purposes. While true, the fact that the statements were voluntary was relevant there because, being voluntary, they were not taken in violation of the Fifth Amendment. ■ A purportedly voluntary statement violates the Sixth Amendment if it is secured after a defendant has asserted the right to counsel and without any waiver of that right. Accordingly, in Sixth Amendment cases the question of voluntariness is not dispositive.

■ We conclude that the court erred in permitting the use of Harper's statement for impeachment purposes. It remains to be determined if the error was harmless beyond a reasonable doubt. (*Chapman* v. *California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711, 87 S.Ct. 824, 24 A.L.R.3d 1065].) Under this analysis Harper's statement clearly was harmless as to his conviction for murder. The evidence that Harper had committed the murder was overwhelming, supported by the testimony of a number of witnesses who clearly had nothing to gain by naming him. There is no

---

[3] Our conclusion is supported by the reasoning of the court in *United States* v. *Brown* (2d Cir. 1983) 699 F.2d 585, decided before the decision in *Michigan* v. *Harvey, supra,* 494 U.S. 344. The defendant in that case also was questioned by the authorities after his indictment and without the benefit of counsel. The court, relying in part on *Portash*, held that as the defendant's resulting statement was taken in violation of the Sixth Amendment, it could not be used either in the government's case-in-chief or for purposes of impeachment.

reason to believe that the jury would have found Harper's version of the events credible had they not also learned that he lied when he denied threatening Clausen.

Harper's convictions of threatening a witness are more problematic. Once the statement to Noland is removed, Harper's convictions for threatening Clausen rest solely on her testimony, which conflicted with his. There was evidence that Harper's community was one where threats are made and often carried out. Some of the witnesses were extremely reluctant to testify because of the fear of repercussions against them. On this evidence alone, the jury reasonably could have believed that Harper, who would kill a person over a $400 debt, would have every reason to threaten witnesses and little compunction against making threats. Clausen's credibility, however, is undermined by her claim that she reported the detention facility threat to one of the escort officers. All three officers testified that Clausen made no such report. Reviewing the whole record, we cannot conclude beyond a reasonable doubt that the jury would have convicted Harper of threatening Clausen had they not learned of his admission to Noland. Appellant's convictions for the crimes charged in counts three, four and five must, therefore, be reversed.

III., IV.*

. . . . . . . . . . . . . . . . . . . . .

The judgment is reversed as to counts three, four and five and in all other respects is affirmed.

Newsom, Acting P. J., and Dossee, J., concurred.

Appellant's petition for review by the Supreme Court was denied June 6, 1991.

---

*See footnote, *ante*, page 843.