[No. G009230. Fourth Dist., Div. Three. June 21, 1991.]

THE PEOPLE, Plaintiff and Respondent, v.
CESAR ELIAS CRIBAS, Defendant and Appellant.

**COUNSEL**

Charles R. Khoury, Jr., and Anthony Dain, under appointments by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp and Daniel E. Lungren, Attorneys General, Richard B. Iglehart, Chief Assistant Attorney General, Harley D. Mayfield, Assistant Attorney General, Janelle B. Davis and Pamela A. Ratner, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**SONENSHINE, Acting P. J.**—Cesar Elias Cribas was convicted by a jury of rape (Pen. Code, § 261, subd. (2)),[1] bribery of witnesses (§ 137, subd. (a)), and conspiring with his brother, Danilo, to bribe witnesses (§ 182). He asserts a tape-recorded conversation between him and the victim was admitted in violation of the mandates of the United States Supreme Court in *Massiah* v. *United States* (1964) 377 U.S. 201 [12 L.Ed.2d 246, 84 S.Ct. 1199], and contained statements which were involuntary. He also challenges the sufficiency of the evidence to support the bribery-related convictions.

I

In March 1989, Cribas met Ernesto Rojas and his girlfriend, Luisa B., in the laundry room of the apartment complex where Cribas resided. Rojas and Luisa had been living with Rojas's uncle, but were having problems there. Cribas offered to allow them to move into his apartment, stating he would be glad to have help with the rent.

Sometime after the two moved into the apartment, Cribas made an unsolicited advance toward Luisa while Rojas was away. As Luisa was cooking, Cribas approached her, fondled one of her breasts, and put a hand down her

---

[1]All statutory references are to the Penal Code unless otherwise specified.

pants. She became upset and told him to leave her alone. He did so and, when Rojas came home, Luisa told him what had happened. Rojas became angry and threatened to hit Cribas, but Luisa talked him out of it by pointing out they would have to move out and had no place to go.

On the following day, Cribas and Rojas were drinking. After a while, Cribas gave Rojas some money and the keys to his car and sent him out to buy some liquor. When Rojas left the apartment, Luisa started to follow but was stopped by Cribas. He took her to the couch and began kissing her forcefully. At one point, Luisa managed to break free and ran to the door, but Cribas followed her and locked it with the deadbolt.

Cribas forced Luisa onto the floor and began raising her skirt and spreading her legs. He then got up and carried Luisa into the bedroom, where he bolted the door and forcibly had intercourse with her. They then heard Rojas pounding on the bedroom door. Luisa broke free and unlocked the door, running into Rojas's arms, crying. Rojas called the police, who arrested Cribas and took Luisa to a clinic.

The next day, April 2, Cribas telephoned Luisa at the apartment and urged her to withdraw the charges so that he could get out of jail. He told her his attorney would take care of having the charges dropped. At this point, the connection was accidentally cut off. She could not remember whether Cribas offered to give her some money during this conversation.

That evening, Cribas's brother, Danilo, came to see Luisa and Rojas and asked them to help Cribas by withdrawing the charges, offering them $300. A few days later, he returned and offered them $500. Rojas told Danilo they would possibly help for $5,000. Rojas testified he tossed out that figure because he wanted to get rid of Danilo and knew he would never be able to raise that much money.

The following day, Rojas and Luisa were evicted from the apartment. They told the police about the telephone call from Cribas and the visits from Danilo. The police obtained a motel room for them and connected a tape recorder to the telephone. Police Officer Allen Caddell instructed them to give Danilo their new telephone number and to tell him to have Cribas call from jail. He also instructed them to accept any money offered by Cribas or Danilo. He told Luisa to speak with Cribas and ask him why he had raped her, in order to obtain his admission that he had indeed done so and to bolster the evidence of the bribery offense.

Cribas called on April 8 and first spoke with Rojas, telling him he was sorry. He said he had been drinking and did not know what he was doing.

Cribas also spoke at length with Luisa.[2] He responded to her questioning by admitting he had raped her and pleading with her to withdraw the charges she had leveled, so that he could get out of jail. Luisa then asked him for

---

[2]The relevant portions of the taped conversation were transcribed as follows:

"L.B.: Huh? (What?)

"C.C.: My brother told me you wanted to talk to me.

"L.B.: Yes.

"C.C.: Uh, huh (Affirmative)

"L.B.: Look, Cesar.

"C.C.: Huh, huh (Affirmative)

"L.B.: If you answer these questions . . .

"C.C.: Uh, huh (Affirmative)

"L.B.: It is possible that I may be able to help you.

"C.C.: Yes, but as I told you, I want to, I want to help you right now, but, but, when I get out then I will. In here how can I be of help to you?

"L.B.: Huh? (What?)

"C.C.: While I am in here how can I help you? I can't help you in here and in whatever you need me for. I am here serving some time. But, I don't know what you want . . . or, what is the question you wanted to ask me?

"L.B.: They are questions. It is not only one question.

"C.C.: Uh, huh (Affirmative) Okay.

"L.B.: Look, I want to know why you raped me. What was your reason.

"C.C.: Huh? (What?)

"L.B.: I want to know why you raped me. What was your reason?

"C.C.: To tell you the truth, I cannot tell you, because, because when one is drunk, one does not know what he is doing, right?

"L.B.: You don't know what you did?

"C.C.: Uh, huh (Affirmative)

"L.B.: But, you did it.

"C.C.: Yes, that is why I'm telling you because when one is very drunk one does not know what he is doing. Since Friday, I was drinking and INAUDIBLE

"L.B.: But you do admit that you did it?

"C.C.: Huh? (What?)

"L.B.: You do accept the fact that you did rape me?

"C.C.: Uh, huh (Affirmative) Well, I accept it.

"L.B.: Okay. The other one.

"C.C.: Uh, huh (Affirmative)

"L.B.: I think that my neighbors found out that I was crying. There are witnesses.

"C.C.: Uh, huh (Affirmative) INAUDIBLE

"L.B.: The last one.

"C.C.: Uh, huh (Affirmative)

"L.B.: Did you enjoy doing what you did to me?

"C.C.: Oh, well, I don't know. INAUDIBLE

"L.B.: What?

"C.C.: No, no, no, I don't think it was right.

"L.B.: You did not think it was right what you did?

"C.C.: No . . . INAUDIBLE Uh, uh (No)

"L.B.: Yes, because my husband is upset.

"C.C.: Yes, I know. I would also be upset. INAUDIBLE

"L.B.: Can you imagaine [*sic*] how I feel knowing that you forced me? Answer me.

"C.C.: Yes, I can imagine how you feel. Certainly, it's true. When one is drunk one does not know.

L.B.: No, now you don't know, but you did do it."

money, which he claimed he did not have and could not get as long as he was in custody. The contents of the conversation were recorded and a transcription of the portion relating to the bribery was admitted into evidence.

Later, Luisa and Rojas received a call from Danilo, which they also recorded, asking if they had spoken with Cribas and offering them money. In another call, they settled on an amount with Danilo, and he was arrested when he went to their motel to deliver it.

At trial, Cribas testified that after Rojas left to buy the liquor, Luisa approached him while he was in his bedroom making a telephone call. She made sexual overtures and he tried to respond, but was unable to achieve an erection. He did not know the bedroom door was locked and believed Luisa locked it. When Rojas began shouting and knocking on the door, Luisa unlocked it and began crying. Cribas also denied touching Luisa the day before.

Following his arrest, Danilo told Cribas he was going to speak to a lawyer about getting Luisa to drop the charges. He told Cribas Luisa wanted to talk to him before she would agree to help, and gave him her number. When Cribas called, Luisa asked him a lot of questions. He told her what she wanted to hear, in hopes of convincing her to withdraw the charges. On cross-examination, the prosecutor questioned Cribas extensively on the portion of the recorded telephone conversation containing admissions to the rape.

## II

Cribas moved to suppress the portion of the recorded statements elicited in the telephone conversation with Luisa relating to the rape, on the ground they violated his Sixth Amendment right to counsel. It was stipulated that, at the time of the taped telephone conversation, counsel had been appointed to represent Cribas. The court denied the motion and ruled the statements could be used to impeach Cribas's testimony.

 Cribas's primary contention on appeal is that Luisa was acting as an agent of the police and conducting an interrogation at the behest of Officer Caddell. Because he had an attorney at the time and he had invoked his *Miranda*[3] rights when the police attempted to question him, he asserts this government action interfered with his Sixth Amendment right to counsel.

---

[3]*Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed. 694, 86 S.Ct. 1602, 10 A.L.R.3d 974].

The Attorney General responds that Luisa was not a government agent and Cribas waived his rights when he initiated the telephone call; further, the police action in recording the call was designed to investigate a new crime, i.e., the bribery of a witness.

Cribas's argument is founded upon a line of United States Supreme Court decisions interpreting the Sixth Amendment, beginning with *Massiah* v. *United States, supra*, 377 U.S. 201. The *Massiah* court held that postindictment communication with an accused, deliberately elicited by a codefendant acting as an agent of the government, interferes with the right to counsel. (*Id.* at p. 206 [12 L.Ed.2d at p. 250].) Applying this rule in *United States* v. *Henry* (1980) 447 U.S. 264 [65 L.Ed.2d 115, 100 S.Ct. 2183], the court found the government had violated Henry's right to counsel when it deliberately elicited statements through a paid informer who was an inmate at the same jail. Even though the informer had been instructed by the government not to initiate any conversation or ask any questions, he had engaged Henry in conversation certain to evoke incriminating statements.

Three factors were highlighted in *Henry*: The informer was acting under instructions from the government; he was ostensibly no more than a fellow inmate; and Henry was in custody at the time. (447 U.S. at p. 270 [65 L.Ed.2d at p. 123].) The court observed that informers generally have an incentive to produce useful information for the government. And, they can take the defendant unawares because the defendant may say things which he or she would not intentionally reveal to government agents. Moreover, there is a "powerful psychological inducement to reach for aid when a person is in confinement. [Citations.] . . . [T]he mere fact of custody imposes pressures on the accused; confinement may bring into play subtle influences that will make him particularly susceptible to the ploys of undercover Government agents." (*Id.* at pp. 270-274 [65 L.Ed.2d at p. 124].)

These principles were carried a step further in *Maine* v. *Moulton* (1985) 474 U.S. 159 [88 L.Ed.2d 481, 106 S.Ct. 477], where the represented defendant initiated a telephone conversation with a codefendant who, unbeknown to Moulton, was cooperating with the state. A meeting was arranged in order to discuss their trial strategy, at which their conversation was recorded. The state maintained there was no interference with the right to counsel, because Moulton had initiated the telephone call and the meeting. The Supreme Court rejected such a distinction, pointing out "the identity of the party who instigated the meeting at which the Government obtained incriminating statements was not decisive or even important to our decisions in *Massiah* or *Henry*." (*Id.* at p. 174 [88 L.Ed.2d at p. 495].)

The court explained that the Sixth Amendment guarantee "includes the State's affirmative obligation not to act in a manner that circumvents the

protections accorded the accused by invoking this right. . . . [K]nowing exploitation by the State of an opportunity to confront the accused without counsel being present is as much a breach of the State's obligation not to circumvent the right to assistance of counsel as is the intentional creating of such an opportunity." (474 U.S. at p. 176 [88 L.Ed.2d at p. 496].)

■ The prosecution had also asserted the statements were admissible because the police had other, legitimate reasons for recording the conversation: The officers wanted to protect the informer's safety in case Moulton found out he was cooperating with them, and they were attempting to gather information about a new offense he was contemplating. The court held these legitimate interests did not justify the use of unlawfully obtained statements at the trial of those charges for which Moulton was represented by counsel. There was no bar, however, to their use in a trial of the new offense. (474 U.S. at p. 180 [88 L.Ed.2d at p. 498].)

In *Kuhlmann* v. *Wilson* (1986) 477 U.S. 436 [91 L.Ed.2d 364, 106 S.Ct. 2616], the high court drew the line at statements which were not elicited, but which were overheard by a paid informant placed in the defendant's cell and told to report any incriminating statements. The so-called "listening post" situation marked the first departure from the policy that "the courts must focus on the state's conduct as a whole, rather than on the informant's." (*People* v. *Whitt* (1984) 36 Cal.3d 724, 741 [205 Cal.Rptr. 810, 685 P.2d 1161].)[4]

With this background, we turn to the facts of the case before us. It is undisputed that Luisa was acting at the behest and encouragement of Officer Caddell to assist him in gathering additional evidence. And, to the extent she was receiving a motel room at taxpayer expense, she was also a paid informant. Indeed, she and Rojas were apparently desperate for a place to live. At oral argument, the Attorney General posited that the consideration they received was not a motivating factor in their cooperation. We disagree. Moreover, it can hardly be claimed that a person claiming to be a victim of a violent crime has no motivation to assist police in gathering evidence to corroborate her allegations. Luisa quite clearly had several incentives to produce useful information.

---

[4]*Whitt* was decided prior to *Kuhlmann* and focuses on whether the informer is acting at the behest of the police or on his or her own initiative. Whether the informer was just listening or questioning the defendant was found irrelevant in Whitt. (*People* v. *Whitt, supra,* 36 Cal.3d at p. 742.) This is in sharp contrast to *Kuhlmann,* where the police did place the informer in an opportune position, but the informer did nothing but listen. However, the portion of *Kuhlmann* which addresses this issue was not necessary to that decision. It primarily concerned the propriety of the court of appeals entertaining a petition for habeas corpus from the prisoner. The Supreme Court found the lower court had acted improperly; it then stated that even if it correctly entertained the petition, it erred in granting *Massiah/Henry* relief.

Turning to the other factors, Cribas, who had no knowledge he was speaking indirectly to the police, had already asserted his right not to incriminate himself. And, of course, he was in custody at the time of the call. Reviewing the substance of the call, Luisa was undeniably eliciting responses and was not simply a passive listener.

The Attorney General contends Cribas initiated the interrogation by voluntarily placing the telephone call.[5] But the same was alleged of the defendant in *Moulton*, who made an unsolicited call, which was recorded, to his codefendant and arranged a meeting. The court found the question of who initiated the call was irrelevant. (*Maine* v. *Moulton, supra*, 474 U.S. at pp. 174-175 [88 L.Ed.2d at p. 495].) "It is [ ] irrelevant to the *Henry* analysis that an accused's statements were voluntarily made. 'Since "coercion" is not a Sixth Amendment question, "voluntariness" simply plays no part in the test of admissibility.' [Citation.]" (*People* v. *Whitt, supra*, 36 Cal.3d at p. 742.)

And, it cannot candidly be asserted that Cribas voluntarily initiated the call. Cribas had placed one unsolicited phone call the day after the rape during which he did no more than beg Luisa to withdraw the charges. Thereafter, his brother handled the matter. Through him, Rojas and Luisa continually held out hope to Cribas that she would help him. Luisa, at Caddell's insistence, told Danilo to give Cribas her new phone number and have him call her. This was phrased as a condition precedent to any further discussion of her dropping the charges.

As pointed out in *Henry*, an incarcerated defendant is especially vulnerable to such incentives. The police used Cribas's desperation as a means of circumventing his right to have counsel present at any questioning, a right he had asserted immediately upon his arrest. Thus, even if an initiation argument were available in this context, we would reject it.

In every sense, the police deliberately created the setting and led Cribas into it. Surreptitious questioning was conducted at their request about a matter on which counsel had been appointed.

Next, the Attorney General argues the police were investigating a new crime and were therefore not interfering with the right to counsel for the offense on which Cribas was represented. We would readily agree if it were

[5]The Attorney General's reliance on *Edwards* v. *Arizona* (1981) 451 U.S. 477 [68 L.Ed.2d 378, 101 S.Ct. 1880] is misplaced. The *Edwards* court held an accused who has invoked *Miranda* rights may not be questioned unless a further conversation is initiated by the accused and there is another admonishment. It is based on the Fifth Amendment, which is not at issue here.

not for the fact Caddell specifically instructed Luisa to obtain an admission from Cribas that he had raped her. Caddell testified one of his purposes was to obtain corroboration of *the rape*. Defense counsel's motion in the lower court was directed only at the first portion of the phone call, which contained damaging admissions about the rape; no effort was made to challenge the latter half, in which Cribas negotiated with Luisa for his release. The portion concerned with the admission of rape could readily have been excised without threatening the evidence of the new crime. In fact, during the trial, only the portion of the tape relating to the bribery charge was admitted in the prosecution's case in chief; the remainder was introduced only as impeachment of Cribas's testimony.

Thus, we must determine whether statements obtained in violation of *Massiah* may be used to impeach the testimony of a defendant. In *People* v. *Harper* (1991) 228 Cal.App.3d 843 [279 Cal.Rptr. 204], the court concluded they could not, distinguishing the recent United States Supreme Court decision in *Michigan* v. *Harvey* (1990) 494 U.S. 344 [108 L.Ed.2d 293, 110 S.Ct. 1176]. The *Harper* court summarized *Harvey* as holding that "a statement taken in violation of 'only a prophylactic rule' may be used for impeachement purposes. It does not, however, follow that a statement taken in violation of the Constitution may be used for impeachment purposes." (*Harper, supra,* 228 Cal.App.3d at p. 851.) The court agreed that violations of prophylactic rules designed to ensure knowing and intelligent waivers were not a bar to use of illegally obtained statements for impeachment where the problem is an *imperfect* waiver. However, it found these rules have "little application where there is no question of waiver. The statement, taken after appellant was indicted, and without any waiver of his right to counsel, simply and unequivocally violated the Sixth Amendment." (*Id.* at p. 852.)

Nor is the fact the statements were otherwise voluntary dispositive. ■ Voluntariness is the sine qua non in a Fifth Amendment challenge because there is no Fifth Amendment violation where statements are voluntary. But "[a] purportedly voluntary statement violates the Sixth Amendment if it is secured after a defendant has asserted the right to counsel and without any waiver of that right. Accordingly, in Sixth Amendment cases the question of voluntariness is not dispositive." (228 Cal.App.3d at p. 853.) Thus, in both Fifth and Sixth Amendment cases, the determinative factor is not whether the statements were voluntary or involuntary, but whether they were or were not obtained in violation of the Constitution. We have already determined the statements in this case were.

■ In determining whether Cribas was prejudiced by the admission of evidence obtained from a *Massiah* violation, the harmless error test of *Chapman* v. *California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824, 24

A.L.R.3d 1065] applies. (*Milton* v. *Wainwright* (1972) 407 U.S. 371, 372 [33 L.Ed.2d 1, 3-4, 92 S.Ct. 2174].) As is typical in rape cases, the evidence consisted primarily of testimony by the accused and the victim. The statements made by Cribas during the telephone conversation acknowledged culpability, but tempered the admission with remarks that he was drunk and did not know what he was doing:

"L.B.: You don't know what you did?

"C.C.: Uh, huh (Affirmative)

"L.B.: But, you did it.

"C.C.: Yes, that is why I'm telling you because when one is very drunk one does not know what he is doing. Since Friday, I was drinking and INAUDIBLE

"L.B.: But you do admit that you did it?

"C.C.: Huh? (What?)

"L.B.: You do accept the fact that you did rape me?

"C.C.: Uh, huh (Affirmative) Well, I accept it."

The admissions that he raped Luisa and accepted responsibility for it are no less damaging because of his drinking. ■ Rape is a general intent crime, and intoxication is not a defense unless it rises to the level of unconsciousness. ■ And, Cribas tendered an apology to Rojas for his conduct during his first phone call. That statement, which contained similar incriminating material, was properly before the jury. However, this was readily explained in the context of Cribas's defense that Rojas and Luisa were lying because they had set him up in an attempt to extort him.

While counsel gamely argued the recorded statements were made in order to tell Luisa whatever she wanted to hear, there is no denying that a recorded statement containing his concession of guilt was damaging to his defense. Moreover, this is not a case where other physical or testimonial evidence combined to produce an overwhelming case.

Looking at the conduct of the jury, it did not arrive at its verdicts until after deliberating for approximately nine hours over a two-day period. During that time, it requested rereading of Luisa's testimony regarding the

day of the rape and sought guidance on the conspiracy instruction. The entire trial, even though conducted through interpreters, lasted only slightly more than two days. Apparently, the jury did not view its decision as clear cut. We cannot say beyond a reasonable doubt that the jury would have reached the same verdict on the rape count in the absence of these admissions.

Thus, upon retrial, the prosecution may not use Cribas's statements relating to the rape, which we quote in footnote 2, *ante*, against him in any manner.[6]

## III

■ Cribas contends there is no evidence supporting the jury's conclusion he committed an act specified within section 137, subdivision (a), which provides that any person who "gives or offers, or promises to give, to any witness, person about to be called as a witness, or person about to give material information pertaining to a crime to a law enforcement official, any bribe, upon any understanding or agreement that the testimony of such witness or information given by such person shall be thereby influenced is guilty of a felony." The information alleged Cribas offered money to Rojas and Luisa to influence their testimony or the information they provided to the police.

Cribas asserts the evidence established he did nothing more than ask Luisa to drop the charges. The Attorney General does not appear to contest this characterization of the evidence, but argues it "would be ludicrous to conclude that an agreement to get the witness 'to drop' a case does not reasonably mean 'to influence a witness not to testify.'" He points out because Luisa did not have the authority to dismiss the case, the only way she could drop the charges was by refusing to testify. However, he points to no evidence Cribas knew that.

Cribas cites *Lichens* v. *Superior Court* (1960) 181 Cal.App.2d 573 [5 Cal.Rptr. 539] which, as he asserts, is strikingly similar to the instant case. Lichens had repeatedly offered to pay his attempted rape victim $500 to "drop the case." He was charged with bribery of a witness under former section 136½ (amended and renumbered as § 138).[7] The appellate court

---

[6]We therefore need not reach Cribas's argument, that the statements to Luisa were involuntary. That issue is directed to the same portion of the recorded conversation. Similarly, we do not reach Cribas's contention that the court erred in denying his request to instruct the jury to disregard the same statements if it found them the product of coercion.

[7]The only apparent difference between section 138, subdivision (a) and section 137, subdivision (a) is the former prohibits bribing "upon any understanding or agreement that the person shall not attend upon any trial or other judicial proceeding," or attempting to dissuade such attendance. Section 137, subdivision (a) prohibits giving or offering to give a bribe under

issued a writ of prohibition, observing that using money to induce the victim to "drop the charge" was not unlawful because only the district attorney could consent to a dismissal. Moreover, it was not the equivalent of inducing her not to attend the trial. (181 Cal.App.3d at p. 576.)

The Attorney General relies on *People* v. *Pic'l* (1982) 31 Cal.3d 731 [183 Cal.Rptr. 685, 646 P.2d 847]. In *Pic'l*, the defendant drafted a document in which the victim agreed to " 'seek dismissal of all criminal charges which may have been filed . . . and to do everything within my power to prevent the filing of any additional charges against any person.' " He also agreed to " 'refuse to prosecute criminal charges against anyone.' " The Supreme Court held it was reasonable for the grand jury to have concluded that non-attendance was within the scope of the agreement "to 'do everything within my power' " and his agreeing to " 'refuse to prosecute' " reasonably contemplated refusing to testify. (*Id.* at p. 740.)

While not directly disapproving *Lichens* v. *Superior Court, supra,* 181 Cal.App.2d 573,[8] the court distinguished it by noting the victim in *Pic'l* had a greater burden in fulfilling his agreement: "he had to '*refuse* to prosecute' and 'do *everything*' to prevent further charges. Absenting himself from trial would have been an obvious means of keeping the bargain." (*Id.* at p. 741.) The court concluded an indictment under former section 136 1/2 "may be supported by an inference, based on the defendant's words or actions, that he has violated the statute; no express statement by the defendant of his intent to prevent the witness' testimony is required." (*Ibid.*)

Applying these principles, the instant case more closely resembles the facts in *Lichens*. Here, too, Cribas did no more than ask Luisa to drop the charges. She testified that during their first telephone conversation, he said he could not continue to help them while in jail and that his attorney would handle having the charges dropped. In their recorded telephone conversation, Cribas again asked Luisa repeatedly to help him get out of jail and once referred to her dropping the charges, but insisted he did not have the money she wanted. Asking her to withdraw the charges is no more the equivalent of influencing her testimony than it is of inducing her not to attend the trial.

---

an agreement or understanding that it will influence the testimony of a witness or information given to law enforcement.

Cribas was originally also charged with violating section 138, subdivision (a) and section 136.1, subdivision (c)(2). During the trial the court dismissed those counts pursuant to section 1118.1.

[8]The Supreme Court expressly declined to reach the issue of the continued viability of *Lichens* in the face of the subsequent amendment of Penal Code section 136½. (31 Cal.3d at p. 741, fn. 4.) We are not confronted with the distinction between the old and new versions of the statute.

However, assuming *Lichens* was correctly decided, Cribas gains little solace from this conclusion, because there is other evidence, not cited by either party, which is sufficient for conviction. Rojas testified that in one of his conversations with Danilo, Danilo suggested he say that on the day of the incident Rojas was drunk, had hit Luisa, and that she suffered from "nervousness" and did not know what had happened.

Because Cribas and Danilo were established as conspirators, Danilo's statements are attributable to Cribas for purposes of the substantive offense. (*People* v. *Brawley* (1969) 1 Cal.3d 277, 289 [82 Cal.Rptr. 161, 461 P.2d 361].) In fact, the jury was instructed with CALJIC No. 6.11, relating to joint liability for statements or acts of conspirators.[9] It would have been well within reason for the jury to attribute Danilo's statements to Cribas.[10]

These words and Danilo's subsequent action in delivering the money lead to a reasonable inference that the objective was to persuade Rojas and Luisa to falsify a statement to the police or in court about the rape. There was substantial evidence to support the conviction.

### IV

Cribas asserts reversal of his rape conviction requires reversal of the bribery and conspiracy convictions. He claims if no crime occurred, neither Luisa nor Rojas fit the definition of a "person about to be called as a witness" to a crime under the bribery statute. Because of the erroneous admission of the statements, he continues, the jury found him guilty of rape without properly considering this issue.

CALJIC No. 7.03, as read to the jury, defined the phrase as follows: "A 'person about to be called as a witness' includes: [any person who knows or

---

[9]"Each member of a criminal conspiracy is liable for each act and bound by each declaration of every other member of the conspiracy if said act or said declaration is in furtherance of the object of the conspiracy. [¶] The act of one conspirator pursuant to or in furtherance of the common design of the conspiracy is the act of all conspirators. [¶] A member of a conspiracy is not only guilty of the particular crime that to [his] [her] knowledge [his] [her] confederates are contemplating committing, but is also liable for the natural and probable consequences of any act of a co-conspirator to further the object of the conspiracy, even though such act was not intended as a part of the original plan and even though [he] [she] was not present at the time of the commission of such act. . . ."

[10]Notably, the jury, in its verdict on the conspiracy charge, specifically found conspiracies to commit *both* sections 137, subdivision (a) and 136.1, subdivision (b). The latter section prohibits attempting to "prevent or dissuade another person who has been the victim of a crime or who is witness to a crime" from pursuing a variety of legal actions. Cribas had originally been charged with this offense but the prosecutor, in midtrial, dismissed this count at the same time as the section 138 allegation, choosing instead to proceed by interlineating a section 137, subdivision (a) charge. Under the circumstances, the dismissal of the section 136.1, subdivision (b) charge may have been ill advised.

who has been told that [he] or [she] will be called as a witness] or [any person who is a material witness to the issues of a case which already has been filed or which thereafter may be filed] or [any person about to give material information pertaining to a crime to a law enforcement official.]" Cribas points out the phrase "pertaining to a crime," in the third alternative bracketed definition, may have been the one upon which the jury settled. He interprets this phrase as requiring a crime which was actually committed.

This interpretation has utterly no legal or logical basis. The gravamen of the offense is the influencing of information given by someone who is or will be involved in legal proceedings. Whether the witness's original accusation is actually true is irrelevant, as is the result of the legal proceeding and whether the witness intends to carry out the agreement to testify falsely. (*People* v. *Pic'l, supra*, 31 Cal.3d at p. 739.)

As the Attorney General explains, the underlying crime need not be prosecuted. And, if there is a prosecution and the evidence proves insufficient for conviction, the offense of bribery is not diminished. There is nothing in the phrase "pertaining to a crime" from which we must conclude it means a crime which has actually been committed. More to the heart of the matter, even an acquittal does not mean a crime did not occur; it simply relieves the defendant of culpability.[11]

V

■ Cribas objects to the failure of the court to instruct, sua sponte, pursuant to CALJIC No. 17.01, that the jury had to agree unanimously on the overt act or acts underlying the conspiracy charge or on the definition of a witness set forth in CALJIC No. 7.03 (see pt. IV, *ante*). There was no error.

We are persuaded that a specific unanimity instruction on overt acts was not required: "Inasmuch as the overt act, though required to establish the existence of a conspiracy, is not an actual element of the crime, it follows that the jury need only be unanimous in finding *an* overt act was done in furtherance of the conspiracy, not in finding a particular act was done. . . . Hence, the overt act is part of the 'theory' of the case, not an act constituting the offense. [Citation.] For the foregoing reasons, . . . a trial court need not instruct the jury they must unanimously agree as to the overt act done in pursuance of a conspiracy." (*People* v. *Jones* (1986) 180 Cal.App.3d 509, 516-517 [225 Cal.Rptr. 697].) Cases taking a contrary position have done so in dicta, with which we disagree. (*People* v. *Ramirez* (1987) 189 Cal.App.3d

---

[11]The defense argument, taken to its logical conclusion, would mean a person who bribed a witness could not be prosecuted if acquittal on the underlying charge results from the suborned perjury.

603 [233 Cal.Rptr. 645]; *People* v. *Brown* (1991) 226 Cal.App.3d 1361 [277 Cal.Rptr. 309].)

CALJIC Nos. 6.10 and 17.50 sufficiently apprised the jury of its duties. CALJIC No. 6.10 told the jury that proof of a conspiracy requires proof of at least one overt act. CALJIC No. 17.50 advised that all 12 jurors had to agree on a decision and to any findings in their verdict. "These most specific instructions must be viewed in conjunction with the unqualified requirements that proof be made beyond a reasonable doubt as to each element of an offense and that the verdict be unanimous. There is no inadequacy in the instruction given." (*People* v. *Skelton* (1980) 109 Cal.App.3d 691, 717 [167 Cal.Rptr. 636].)

For much the same reason, the CALJIC 17.01 instruction was not required for the definition of a "person about to be called as a witness." This constitutes a theory of guilt, on which a jury need not be specifically instructed they must agree. (*People* v. *Failla* (1966) 64 Cal.2d 560, 569 [51 Cal.Rptr. 103, 414 P.2d 39].)

As to the rape count, the judgment is reversed. Accordingly, the matter is remanded for resentencing on the bribery and conspiracy convictions. In all other respects, the judgment is affirmed.

Wallin, J., and Crosby, J., concurred.

A petition for a rehearing was denied July 10, 1991, and the petitions of both respondent and appellant for review by the Supreme Court were denied September 26, 1991.