[No. F012777. Fifth Dist. Jan. 16, 1991.]

THE PEOPLE, Plaintiff and Respondent, v.
ROBERT SCOTT BROWN, Defendant and Appellant.

COUNSEL

Gregory Marshall, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Richard B. Iglehart, Chief Assistant Attorney General, Arnold O. Overoye, Assistant Attorney General, Shirley A. Nelson and Stan Cross, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**THAXTER, J.**—Appellant Robert Scott Brown was charged with murder (Pen. Code,[1] § 187; count 1), conspiracy to commit robbery (§§ 182/211; count 2) and robbery (§ 211; count 3) all as the result of the robbery and killing of Thomas Owen. He was also charged with personally using a knife in the commission of each offense (§ 12022, subd. (b)).

The jury was unable to agree on the murder charge, but it found Brown guilty of conspiracy and robbery. The special enhancement allegation of personally using a knife was found not true. On the conspiracy count the jury found that only one of three charged overt acts was committed.

We will reverse the conspiracy conviction because the sole overt act found by the jury occurred after completion of the conspiracy's objective, robbery. We will reverse the robbery conviction under *People v. Green* (1980) 27 Cal.3d 1 [164 Cal.Rptr. 1, 609 P.2d 468], because we are unable

---

[1] All statutory references are to the Penal Code unless otherwise indicated.

to determine from the record whether that verdict rested on a legally correct theory or on one which is legally incorrect.

FACTS

*The Prosecution's Case*

On the evening of November 8, 1988, Brown went with his girlfriend Tina Eubank to The 11th Street Lounge, a bar in Modesto, California. Also present at the bar that evening were George Patrick Salter, who worked at the bar as a bouncer and general helper, the bartender Rachel Benge, Pam Anderson, and the decedent Thomas Owen. Owen was an elderly transient who cashed his social security checks earlier in the day. Both Anderson and Eubank were prostitutes.

Owen was intoxicated and "flashing" money. At one point during the evening, Eubank told Brown that Owen had a lot of money and suggested they "roll" Owen. Although Brown did not respond to Eubank's suggestion and Eubank did not discuss the matter with Brown further, Brown did tell Eubank to keep an eye on Owen. Later, Brown told Eubank not to "worry," that he had another "scheme going." At one point Owen went into the bathroom. Brown asked Eubank where the "old man" had gone and Eubank, not knowing, went to the door of the bar to look for Owen.

At about 9:30-10 p.m., Owen wanted Benge to get him a taxi. Benge asked Anderson if she would give Owen a ride home. Benge knew Anderson sometimes provided a taxi service for bar patrons. Anderson said yes and Owen agreed to go with her. Before Anderson and Owen left the bar, Eubank asked Anderson if she could go with them because she wanted to "roll" Owen. Anderson said no. Salter, Brown and Anderson were seen talking together at the bar before Anderson left. During Anderson's absence, Salter and Brown left the bar and returned together on several occasions thereafter.

Anderson took Owen to the address he gave her. She dropped Owen off just past a house near the river by the pet cemetery. She did not see where Owen went because she immediately drove off. Owen paid Anderson $5 for the ride.

When Anderson returned to the bar, she told Eubank where she had taken Owen. Anderson knew Eubank wanted to steal Owen's money. About 45 minutes after Anderson returned, Salter said to Anderson "it's about time." Anderson understood this meant Salter and Brown wanted her to

take them to Owen so they could rob him. Anderson expected to get some money for her trouble.

Michael Smith testified he was at the bar that night and saw Salter and Brown leave with Anderson. He also said Eubank and Brown both told him they were going to roll the elderly man sitting at the bar, later identified as Owen.

Anderson testified she, Salter, and Brown drove to the river where she had earlier dropped off Owen. Salter had a baseball bat and a flashlight he had taken from the bar. Brown had the knife he customarily wore. Anderson testified that when they arrived, Brown and Salter left the car and she stayed behind and waited. Salter and Brown returned to the car about 30 to 40 minutes later. After Salter got into the car he mentioned the possibility of blood on the bat. Anderson told him to wipe it with a rag in the back seat. Anderson testified Salter also said he might have broken Owen's knee. Other than these comments, Anderson testified the three did not discuss what had happened.

Anderson stated she then drove away and pulled onto a side street where Salter counted out the money into three piles. Each of the three received a share. She received about $125. Anderson testified the three then returned to the bar and entered it separately but within a few minutes of each other. Later, when leaving to go home, Anderson drove Salter around to an alley behind the bar where there was a dumpster so he could get rid of the bat.

Eubank testified Brown came up to her upon returning to the bar and whispered in her ear that Owen was dead before they left him. According to Eubank, Salter suggested that she, Brown and Salter go to a motel together but she and Brown ignored him. Brown and Eubank went to a restaurant for something to eat and then to a motel. According to Eubank, Brown paid for both the meal and the room.

Eubank testified Brown told her Salter hit Owen with the bat and shattered his kneecap. She said Brown told her, "I was tired of watching [Salter] have all the fun, so I stabbed the guy." Brown also said they left the victim with one leg bent up around his neck. Eubank claims she saw Brown wash blood off his knife, a folding knife with Harley-Davidson wings on the sheath.

The next morning Eubank and Brown went to the Sunshine Place, a hangout for transients. Eubank left with others because she felt she could no longer trust Brown.

The police found Owen's body on November 12, 1988, while acting on an anonymous tip. The tipster was later identified as Chris Wolford, a friend of Smith's and Eubank's who was also present at the bar on November 8th. Owen had been stabbed six times and hit on the head with a blunt instrument, possibly a baseball bat or walking stick. Owen died from the stab wounds to his chest. He had a blood-alcohol level of .17 percent. Owen's left femur was broken and his leg was bent up around his neck. The break occurred after death. There was no injury to the kneecap.

A bat was recovered from the bar but no blood was detected. Several knives were found at Brown's camp but none bore Harley-Davidson wings. There was no blood found in Anderson's car.

*Defense*

Brown testified in his own behalf. He testified he was at the bar with Eubank on November 8 but left to try to purchase some marijuana for several friends, including Salter. Linda Gatewood testified she was employed at the Sunshine Place. She gave Brown $25 that evening to purchase some "weed." Brown testified Salter gave him $35 to buy a higher grade "weed." According to Brown, he was gone from the bar for approximately two hours, returning at 11:30 p.m. During that time he was able to purchase Salter's "weed" but was unable to find the lesser grade Columbian wanted by Gatewood.

When Brown returned, he gave Salter the marijuana he had purchased. Salter gave him two "joints" for his trouble. Brown and Eubank then left to go to a restaurant to eat. According to Brown, Eubank paid for the meal. She also invited him to spend the night with her at a motel room she had for the night, paid for by an earlier "date." Brown refused because he believed his relationship with Eubank to be over. Instead, he returned to his camp. He did not see Eubank until the next day at the Sunshine Place where the two argued about Brown's invitation to another woman to spend the night at his camp.

Brown denied going out to the river to rob Owen. He denied stabbing Owen or planning the crimes with Salter or Anderson. He testified he was carrying a straight-blade knife that evening, which he has since lost, and did not own a knife with Harley-Davidson wings. He claims Eubank suggested robbing Owen but that he did not act on her suggestion. He testified he and Salter talked to Anderson at the bar about getting some "weed" because Salter said she was interested. Anderson chose not to make a purchase because the drug was too expensive. Brown saw Anderson leave with Owen.

Eubank was apparently not charged with any crime. Anderson was charged and testified pursuant to an agreement with the prosecutor under which she was permitted to plead guilty to lesser charges. Salter was charged and tried separately.

## DISCUSSION

### I. CONSPIRACY COUNT

■ Appellant contends the jury's findings are insufficient to support the conspiracy conviction because the only overt act it found to be true was committed subsequent to the robbery. The contention has merit.

The jury convicted Brown of conspiracy. Although three overt acts were alleged in the information and presented to the jury for decision, the jury made a finding only as to one.[2] It found that Brown shared in the proceeds of the robbery. Brown asserts that this finding cannot be used to support the conviction for conspiracy because it is an act committed subsequent to the completion of the primary objective of the conspiracy.

■ Section 184 provides that no agreement to commit a crime amounts to a conspiracy unless some act besides the agreement is committed to effect the object of the agreement. The great weight of authority holds that in light of the statutory language the elements of a conspiracy are: 1) an agreement to commit a crime, and 2) an overt act done by a member of the conspiracy in furtherance of the agreement. (*People* v. *Cockrell* (1965) 63 Cal.2d 659, 667 [47 Cal.Rptr. 788, 408 P.2d 116]; *People* v. *Bratis* (1977) 73 Cal.App.3d 751, 765 [141 Cal.Rptr. 45]; *People* v. *Earnest* (1975) 53 Cal.App.3d 734, 745 [126 Cal.Rptr. 107]; *Feagles* v. *Superior Court* (1970) 11 Cal.App.3d 735, 739 [90 Cal.Rptr. 197].) Section 182, subdivision (b) (formerly § 1104) provides that the defendant cannot be convicted unless at least one overt act is alleged and proved by the prosecution.

---

[2] The jury found only the following overt act allegation to be true:

"That thereafter, at and in the County of Stanislaus, and in pursuance of said conspiracy and to effect its object, the said defendant, did share in proceeds of the robbery obtained by all three defendants."

The jury did not find the following overt act allegations to be true:

"That thereafter, at and in the County of Stanislaus, and in pursuance of said conspiracy and to effect its object, the said defendant PAMELA ANN ANDERSON did drive defendants GEORGE PATRICK SALTER AND ROBERT SCOTT BROWN to the victim's location for the purpose of robbing him.

". . . . . . . . . . . . . . . . .

"That thereafter, at and in the County of Stanislaus, and in pursuance of said conspiracy and to effect its object, the said defendant GEORGE PATRICK SALTER obtained the bat normally kept at [T]he 11th Street Lounge and took this with him to the scene of the crime."

The purpose of the overt act requirement is to allow the conspirators the opportunity to reconsider and withdraw their agreement. (*People* v. *Zamora* (1976) 18 Cal.3d 538, 549, fn. 8 [134 Cal.Rptr. 784, 557 P.2d 75].) A further purpose is to prove the existence of the agreement. (*People* v. *Olson* (1965) 232 Cal.App.2d 480, 490 [42 Cal.Rptr. 760]. See also 1 Witkin & Epstein, Cal. Criminal Law (2d ed. 1988) Elements of Crime, § 178, pp. 198-199.)

■ In *People* v. *Zamora, supra,* our Supreme Court held that "acts committed by conspirators subsequent to the completion of the crime which is the primary object of a conspiracy cannot be deemed to be overt acts in furtherance of that conspiracy." (18 Cal.3d at p. 560.)

Requiring that the overt act precede commission of the crime is consistent with the controlling statutory language. An agreement becomes punishable only upon the doing of an act "to effect" the object of the agreement. (§ 184.)[3] The object of a punishable conspiracy is commission of a crime. (§ 182, subd. (a)(1).) The verb "to effect" means "to bring about; produce as a result; cause; accomplish." (Webster's New World Dict. (3d college ed. 1988) p. 432.) An act cannot bring about, produce, cause, or accomplish commission of a crime which has already been committed.

■ In response to Brown's contention, respondent dismisses the *Zamora* holding as "inapposite" because the issue involved there was application of the statute of limitations. We cannot agree with respondent. While it is true the issue in *Zamora* concerns the statute of limitations, the Supreme Court's analysis begins and rests on a definition of the nature of an overt act and its relationship to the conspiracy's primary objective. That analysis is equally applicable to the issue before us. We further note that the Supreme Court cited *Zamora* approvingly in *People* v. *Marks* (1988) 45 Cal.3d 1335, 1345 [248 Cal.Rptr. 874, 756 P.2d 260], without any indication that the *Zamora* rule is restricted to statute of limitations issues.

Neither the statutes nor case authority support respondent's suggestion that the object of the conspiracy (for purposes of determining the "overt act") is the conspirators' motivation for committing the crime, rather than accomplishment of the crime itself. In *Zamora* the Supreme Court quoted from *Chavez* v. *United States* (9th Cir. 1960) 275 F.2d 813, 817, that " 'an overt act is an outward act done in pursuance of the crime and in manifestation of an intent or design, *looking toward the accomplishment of the crime*.' " (18 Cal.3d at p. 549, fn. 8, italics added.) Sharing in the proceeds of the robbery is not an act looking toward the accomplishment of the crime

---

[3] Section 182, subdivision (a) likewise fixes venue in "any county in which any overt act *tending to effect* such conspiracy shall be done." (Italics added.)

of robbery. True, the conspirators were motivated by a desire to obtain and divide Owen's money. What brought them within the ambit of the criminal conspiracy laws, however, was the agreement to accomplish their desire by committing robbery. Robbery was the primary objective of the conspiracy.

Respondent's reliance on the body of authority defining that period of time when a conspirator will be held liable for acts of a coconspirator is unpersuasive. The cases cited are of two genre: They are either cases determining whether a defendant can be held liable for acts of a coconspirator, or whether a statement of a conspirator can be admitted against a coconspirator when made after completion of the substantive crime. (*People* v. *Carroll* (1970) 1 Cal.3d 581 [83 Cal.Rptr. 176, 463 P.2d 400]; *People* v. *Saling* (1972) 7 Cal.3d 844 [103 Cal.Rptr. 698, 500 P.2d 610]; *People* v. *Humphries* (1986) 185 Cal.App.3d 1315 [230 Cal.Rptr. 536]; *People* v. *Garewal* (1985) 173 Cal.App.3d 285 [218 Cal.Rptr. 690].) Both lines of authority center on the relationship between the conspirators and how far liability under the conspiracy, *once it is established*, will extend. The rationale underlying those decisions differs significantly from that underlying establishment of a conspiracy as a punishable offense in the first instance and cannot be used to avoid the holding in *Zamora*.

We also reject respondent's contention that the overt act requirement is not an element of the crime of conspiracy and thus the conviction may be sustained irrespective of the jury's finding, or more appropriately, nonfinding. Respondent cites *People* v. *Jones* (1986) 180 Cal.App.3d 509, 516 [225 Cal.Rptr. 697], to support this contention but does little more than raise the issue by citing *Jones*. Respondent does not explain how adopting *Jones* would assist its position. In any event, this court has already determined that an overt act is an essential element in the crime of conspiracy (*Feagles* v. *Superior Court, supra*, 11 Cal.App.3d at p. 739.)

Based on the Supreme Court's explicit statement in *People* v. *Zamora, supra*, we hold that a conspiracy conviction cannot stand if the only overt act found occurred after commission of the criminal offense which was the conspiracy's object. Having so concluded, we must now examine the record to see if Brown's conviction rests on a postcrime overt act.

Respondent argues it is well settled a robbery is not confined to the actual taking of the property and extends to the period of escape and disposal of the stolen goods, citing *People* v. *Carroll, supra*, 1 Cal.3d 581 at page 585. The trial court instructed the jury on this concept by giving CALJIC No. 9.44 (1988 rev.) as follows:

"The commission of the crime of robbery is not confined to a fixed place or a limited period of time.

"A robbery is still in progress after the original taking of physical possession of the stolen property while the perpetrator is in possession of the stolen property and fleeing in an attempt to escape. Likewise it is still in progress so long as immediate pursuers are attempting to capture the perpetrator or to regain the stolen property.

"A robbery is complete when the perpetrator has eluded any pursuers, has reached a placed [*sic*] of temporary safety, and is in unchallenged possession of the stolen property after having effected an escape with such property."

In making this argument respondent necessarily relies on Anderson's testimony that Brown received his share of the stolen money in Anderson's car while Anderson, Salter, and Brown were returning from the crime scene to the bar. If events occurred as Anderson testified, she, Salter, and Brown waited until they left the river area and drove to a residential side street where they could safely divide the money. They were not being pursued, they were in unchallenged possession of the stolen money, and they were not at risk of discovery. We find no evidence supporting a finding that division of the money occurred while the robbery was still in progress. Thus, even read in the light most favorable to the conspiracy conviction, the record reveals that division of the spoils came after completion of the robbery and after Anderson, Salter, and Brown left the scene of the crime.

The record does contain evidence, apart from Anderson's testimony, from which the jury could reasonably infer that Brown shared in the robbery proceeds without having been present at the scene with Anderson and Salter. There was testimony that after Brown returned to the bar he and Eubank went to dinner and then shared a motel room. The evidence conflicted on who paid for the meal and room. Vicki Chadwick testified that shortly after the crime Eubank suddenly had money but had none before. Thus the jury could have concluded Brown shared in the robbery proceeds either directly or through Eubank but that the prosecution failed to prove his direct involvement in the robbery beyond a reasonable doubt.

We conclude that under any version of the evidence the single overt act found by the jury occurred after the conspiracy's objective—robbery—had been accomplished. Thus, under the *Zamora* rule, Brown's conspiracy conviction must be reversed.

## II. THE ROBBERY CONVICTION

██  Appellant argues his conviction of robbery was predicated solely on membership in the conspiracy, and that invalidity of the conspiracy finding

infects the robbery verdict requiring reversal. We agree with appellant's conclusion.

The jury was given CALJIC No. 6.11 which reads as follows:

"Each member of a criminal conspiracy is liable for each act and bound by each declaration of every other member of the conspiracy if said act or said declaration is in furtherance of the object of the conspiracy.

"The act of one conspirator pursuant to or in furtherance of the common design of the conspiracy is the act of all conspirators.

"A member of a conspiracy is not only guilty of the particular crime that to his knowledge his confederates are contemplating committing, but is also liable for the natural and probable consequences of any act of a co-conspirator to further the object of the conspiracy, even though such act was not intended as a part of the original plan and even though he was not present at the time of the commission of such act.

"You must determine whether the defendant is guilty as a member of a conspiracy to commit the crime originally contemplated that is, robbery, and, if so, whether the crime alleged in Counts I (Murder) was a natural and probable consequence of the originally contemplated criminal objective of the conspiracy."[4]

Under the evidence we see three possible bases for the jury's verdict finding Brown guilty of robbery. They are: (1) personal participation in the robbery; (2) membership in the conspiracy before, but without personal participation in, the robbery; and (3) joinder in the conspiracy after completion of the robbery. The first theory is difficult to reconcile with the jury's failure to find Brown used a knife in commission of the robbery and its failure to find that Anderson drove Brown and Salter to the crime scene.

When the record is viewed in light of the jury's findings, it is possible the jury concluded Brown was a part of the initial suggestion to "roll" Owen, but then left to look for drugs, returning to the bar after the crime had been

---

[4] Although the last paragraph of this instruction is tailored to instruct on liability as a co-conspirator for Owen's murder, the remaining instructions, when read as a whole, support the conclusion a reasonable jury would understand that conspirator liability extends to the robbery as well.

committed and then sharing in the proceeds of the robbery. The evidence supports this possibility. Benge and Eubank both testified in various respects that Brown talked with Eubank, Anderson, and/or Salter before Anderson and Owen left the bar. Smith testified Brown told him he planned to rob Owen. Eubank testified Brown said he had a "scheme of his own." Thereafter Brown left the bar. Brown said he went to purchase marijuana and returned to the bar later.

While the second theory is supported by substantial evidence, we have no way of knowing whether the jury based its verdict on it or on the theory that Brown did not join the conspiracy until after the robbery was completed. If the verdict rests on the latter theory, it cannot stand because "[a] conspirator cannot be held liable for a substantive offense committed pursuant to the conspiracy if the offense was committed *before* he joined the conspiracy." (*People* v. *Marks, supra*, 45 Cal.3d at p. 1345, italics in original; see also 1 Witkin & Epstein, Cal. Criminal Law, Elements of Crime, *op. cit. supra*, at p. 204.) As stated in our discussion of the conspiracy count, the verdict is consistent with this legally unsustainable theory.

The difficulty in ascertaining the basis upon which the jury reached its verdict on the robbery count is exacerbated by the court's failure to instruct the jury that it had to find Brown joined the conspiracy *before* the crime was committed (CALJIC No. 6.19). We do not decide, as appellant requests, that failure to give CALJIC No. 6.19 sua sponte was reversible error. We merely conclude that the absence of that instruction precludes us from finding that the jury did not rest its verdict on a conspiracy theory based on acts occurring before Brown joined the conspiracy.

Since both theories of coconspirator liability for the robbery are sustainable on this record and because it is impossible to tell under which theory the jury reached its verdict, the robbery conviction is suspect and must be reversed. (*People* v. *Green, supra*, 27 Cal.3d 1, 69, 71 [164 Cal.Rptr. 1, 609 P.2d 468].)

In view of our conclusion, we do not reach appellant's final contention that the court erred by not instructing on the lesser included offense of grand theft and the lesser related offense of receiving.

## DISPOSITION

The judgment is reversed.

Ardaiz, Acting P. J., and Vartabedian, J., concurred.