94 Cal.Rptr.2d 561 (2000)
79 Cal.App.4th 1033
The PEOPLE, Plaintiff and Respondent,
v.
Susan Lee RUSSO, Defendant and Appellant.
In re Susan Lee Russo, On Habeas Corpus.
Nos. F027481, F033159.
Court of Appeal, Fifth District.
April 11, 2000.
*562 Jim Fahey, under appointment by the Court of Appeal; George Nuñez, Fresno; and Ralston L. Courtney, for Defendant, Appellant and Petitioner.
Daniel E. Lungren and Bill Lockyer, Attorneys General, George Williamson and David P. Druliner, Chief Assistant Attorney General, Robert R. Anderson, Assistant Attorney General, Jeffrey D. Firestone, Robert P. Whitlock and Edgar A. *563 Kerry, Deputy Attorneys General, for Plaintiff and Respondent.
Certified for Partial Publication.[*] Review Granted July 26, 2000.

OPINION
THAXTER, J.
A jury convicted appellant Susan Lee Russo of the first degree murder of her husband, David Russo, in violation of Penal Code section 187[1] (count one), conspiracy to commit murder in violation of sections 182 and 187 (count two), and soliciting another, to wit, Cecilia Martin, to commit and join in the commission of the murder of Bobby Morris in violation of section 653f, subdivision (b) (count three). In addition, the jury found true two special circumstances allegations: appellant killed the victim while lying in wait within the meaning of section 190.2, subdivision (a)(15), and appellant killed the victim for financial gain within the meaning of section 190.2, subdivision (a)(1). Finally, on the conspiracy count the jury found that at least one of ten alleged overt acts was committed.
Codefendants Bobby Morris and Jason Andrews were jointly tried with appellant. Each was charged with the murder of David Russo in count one and with conspiracy to commit murder in count two, along with the special circumstances allegations. The jury found Morris guilty of first degree murder, but deadlocked on the two special circumstance allegations and on count two. The court declared a mistrial on the special circumstance allegations and count two. The jury deadlocked on counts one and two as to Andrews, and the court declared a mistrial as to those counts.
The court sentenced appellant to a term of life without possibility of parole on the first degree murder conviction. Appellant also received a consecutive 25-year-to-life term on the conspiracy conviction, and a six-year consecutive term on the solicitation conviction. A $10,000 restitution fine was imposed pursuant to section 1202.4.
Appellant contends the court erred by ordering her sentence on count two to run consecutive to that on count one, and that the judgment must be reversed because of inconsistent verdicts and instructional error. In her petition for writ of habeas corpus, which we have consolidated with the appeal, appellant seeks relief based on alleged newly discovered evidence and her trial counsel's conflict of interest. We find merit only in the argument regarding the consecutive sentence for count two. We will order that the sentence on count two be stayed pursuant to section 654, and in all other respects will affirm.

FACTS
Prior to his death, victim David Russo was on active duty in the United States Navy. In August 1993, Joseph Gerber, who was retired from the Navy, went to the home of David and appellant in Riverdale to explain appellant's active duty survivor benefits in the event of David's death. Gerber told the Russos that appellant would receive about $206,255 within six months of David's death and would also receive a monthly payment of about $2,500, less taxes, for the rest of her life. Assuming appellant lived a normal life span, her total compensation, in the event of David's death, would be nearly $1 million. When he heard this, David laughed and said, "I'm probably worth more dead than alive."
One day late in 1993 or early 1994, Glenn Ohler, a neighbor, was playing cards with the Russos. Appellant and David got into a verbal disagreement. Appellant taunted David, who told her to stop. Appellant then said, "Well, I can just have you taken out at any time." Appellant told David she had friends in high places, that she was connected to the Mafia, and that she could put a "hit" out on him.
Ohler knew David had a number of guns in the house. He had seen a nine-millimeter Beretta, a couple of handguns, and a Russian rifle, an AK-47. Ohler and David *564 had gone target shooting a couple of times with one of these weapons.
By July of 1994, David had developed some emotional problems. His father passed away. He had been through a divorce before and feared his marriage to appellant was in trouble. David began seeing Judith Rose, a Fresno counselor. His first session with Rose was on July 6, 1994,[2] the second was on July 13 at 5:00 or 6:00 p.m.
At approximately 9:15 p.m. on July 13, Ronald Bass went to the Russo residence to get some papers from David. The two men went outside and talked for awhile. After Bass had been at the house for about 40 minutes, David stated he had to go to sleep because he was working the next day.
Eugene Stokes, who worked with David at the naval base in Lemoore, came to the Russo residence on July 14 at 7:00 a.m. to give David a ride to work. Appellant told Stokes David had left for cigarettes and gas the night before, about 11:00 p.m., and had not come back. Appellant sounded concerned, but not overly so.
About 7:30 a.m. on July 14 Herman Dunkerken, a farmer who lived in the rural area between Laton and Riverdale, saw a male, dressed in shorts and a tank top, walking nervously down the street outside Dunkerken's kitchen. The man had a tattoo on one of his upper arms. He was moving quickly, seemed nervous, and kept turning around and looking back. Dunkerken later found an abandoned car on Maple Avenue, near the river, about a mile from his home. The driver's side window was down and the backseat was covered to the top of the seat with sleeping bags and blankets.
At 8:30 a.m. on July 14 Matthew Raven, a coworker of David's, got worried about his absence and telephoned the Russo residence. Appellant told Raven David had gone out for cigarettes and gas the night before and had not returned. Appellant sounded concerned. Appellant told Raven that David might be in San Diego with his son who was having problems. In a later phone conversation that same day, appellant asked if David's paycheck would be deposited in the bank account the next day, which was payday.
David's mother spoke with appellant on the telephone late in the afternoon on July 14. Appellant told her she and David were doing great and getting better. She did not tell David's mother David was missing.
William Cole, David's best friend and coworker, went to the Russo home on the evening of July 14. David was not there, but appellant was present with a man she introduced as "Jason." Appellant told Cole David went out for cigarettes and gas the night before, but had not returned. Appellant expressed concern about how she was going to get David's paycheck because the next day was payday. Appellant suggested David might be with his friend Jimmy in Las Vegas. Cole noticed David's white Dodge Intrepid was not there. Cole knew David kept guns in his house because he talked often about his AK-47 and nine-millimeter Beretta.
Later in the evening on July 14 Fresno County Deputy Sheriff Myron Toste found David's white Dodge Intrepid in a remote rural location, on a road that winds around the Kings River. In the backseat of the car Deputy Toste found a pile of sleeping bags. David's deceased body was found inside the sleeping bags. The body was naked except for black shorts which were pulled down around his hips, exposing the genital area. The coroner later determined David had died from a single gunshot to the back of the head.
While several law enforcement personnel examined the scene where David's body was found, Detective Melinda Ybarra went to the Russo residence and waited for appellant to return. About 7:45 a.m. on July 15 appellant and Andrews arrived *565 on the victim's motorcycle. Detective Ybarra told appellant a body had been found in David's car. Appellant remained calm, but said she hoped it was not David's body. Appellant permitted Detective Ybarra to walk through the house. Detective Ybarra noticed the house's interior was very neat and orderly. Detective Ybarra took appellant to the sheriffs department for questioning; Andrews was taken separately.
Detective Robert Moore interrogated Andrews. Andrews told Detective Moore that appellant was his good friend and housekeeper. Andrews said he and appellant had been out on the motorcycle looking for David since about 10:00 p.m. the night before. Andrews stated his relationship with appellant was a platonic one. He did not learn of David's death until the detective told him.
Detective Moore then spoke with appellant. Appellant told Detective Moore that David had been getting counseling in Fresno, that she and Andrews were friends, and that she and David had not had guns in their house for over three years. She confirmed that she cleaned houses to earn income. She told Detective Moore that David had gone out for cigarettes and gas about 10:30 or 11:00 p.m. on July 13. Detective Moore asked appellant if there was any blood in her house. She stated there was not. She also told Detective Moore he would find no bullets in the house, although Detective Moore had not given appellant any information on how David had died.
Detective Moore told appellant he knew David was killed in his house. Appellant then told Detective Moore she let some people into the house about 1:00 a.m. on July 14. She stated she saw David's nine-millimeter Beretta gun. She told the people her husband was asleep. She told them to keep their voices down because the children were sleeping. She stated David was shot with a Beretta nine-millimeter, but she had given the gun to someone on July 12. Appellant stated the shot had been muffled and had occurred while she was checking on one of her children. Appellant stated she and the other people then wrapped David's head in a garbage bag, his body in sleeping bags, tied ropes around the body and put it into the Intrepid. She later cleaned up the bedroom. She had tried to put David's black shorts onto his body, but could only get them up to his knees. She admitted she had previously discussed David's killing with someone, that she knew about the insurance policy, that she was going to buy a house and pay bills with the insurance money, and that the killing was a stupid thing to do. Appellant stated the car was going to be torched.
Detective Christian Curtice later examined the interior of the Russo home and found bloodstains on the master bedroom carpet, next to the bed. Detective Curtice found a pillowcase whose pattern and color matched the pillowcase found on David's head. He also found trash bags like the one found on the body, as well as yellow rope like that used to tie up the body. Detective Curtice subsequently found a shotgun, an AK-47 rifle and a .357 magnum revolver in Andrews's residence. The serial numbers on the rifle and revolver matched those on paperwork found at the Russos' residence.
Appellant, Andrews and Morris were all arrested and placed in jail. On August 2 appellant approached fellow inmate Cecelia Martin, told her she wanted Morris killed in his cell, and asked Martin if her husband, who was also in jail, could do the job. Appellant explained that if Morris were dead, she would be in the clear because it was his word against hers. Appellant told Martin she and Andrews were lovers, and she could get Martin and her husband out of jail on bail. Martin gave Detective Moore a taped statement about what appellant had said.
Cynthia Greene testified she met appellant in jail in 1994. Appellant told Greene she was in custody for her husband's murder. *566 Appellant asked Greene to testify that Greene was David's lover. Appellant thought this would give credibility to her claim that she was an abused wife. Appellant did not offer Greene money for the proposed statement. Greene later heard appellant talking with Martin about having two people, "Bobby" and "Jason," killed. Appellant told Martin to make the killings look like suicides. Greene told Detective Moore what she had heard.
At the close of the prosecutor's case-in-chief it was stipulated that the bloodstains on the pillowcase found in the Intrepid matched the bloodstains in David's bedroom. It was also stipulated that there were no fingerprints inside the Intrepid. It was further stipulated that if appellant's daughter were called to testify, she would say she saw appellant shampoo rugs, wash walls and act very nervous on July 14. It was also stipulated appellant's daughter would testify appellant had stayed at Andrews's residence previously and that appellant had asked her daughter to lie about appellant's whereabouts on certain occasions.
Travis Hayes testified that at the time of David's death he had known Andrews for four to five months and appellant for one to two months. Andrews introduced appellant to Hayes as his "old lady," and Hayes saw Andrews and appellant treat each other affectionately. On July 13 Hayes had lunch with Andrews and appellant at a McDonald's in Fresno. Andrews told Hayes he wanted David killed as he left his counselor's office that evening. Appellant stated she could get Hayes whatever money he wanted. Hayes replied that he would think it over. Andrews had a nine-millimeter handgun strapped to his side and a sawed-off shotgun in the backseat of the car. Andrews and appellant dropped Hayes off at his home and gave him $100, but did not say what the money was for. Andrews told Hayes to page him at 6:00 or 6:30 that night. Hayes did page Andrews, but Andrews did not respond.
Hayes later told Andrews he could not go through with the crime, but that he had spent the $100 on drugs and would repay Andrews later. Andrews told Hayes he would catch David later that night when he returned home. Two days later, Morris picked up Hayes and took him to Andrews's home. Andrews and appellant were there with a group of people. Andrews told Hayes the killing had already been accomplished and that he wanted Hayes to burn David's car. Hayes drove a pickup truck by David's car, but kept right on going because he had no intention of burning the car. Hayes passed a "county car" as he was driving past David's car.
Steven Glick testified he came home from work on the evening of July 13 to find a number of people at his house, including Andrews and Morris, who were acquaintances of his. Morris and his wife Doris had been staying at Glick's until they found a home. At some point in the evening, both Andrews and Morris left, although Glick was not sure if they left together. The next morning, about 4:00 a.m., Morris returned to Glick's house and asked that Glick quickly repair the taillight on his car. While Glick worked, Morris sat in his car and listened nervously to police calls over a scanner. As soon as his car was repaired, Morris followed a white car that came by the house.
Michael Crawford testified he was at his residence on the evening of July 14 with various individuals, including Morris and Morris's wife, Doris. Crawford heard Morris ask Doris if she knew where the bullets were; she replied that she did. Morris told Doris to get rid of the bullets. Crawford then saw bullets in Doris's purse as she was rummaging through it. A short time later, sheriffs deputies came to the Crawfords' front door. Morris left quickly through the backyard.
James Plantz testified that he knew Morris and Andrews and was involved in drug dealing with them prior to David's death. About four days before David's *567 death, Morris asked Plantz if he or anyone he knew would kill someone for $100. Morris stated he would assist the other person, but the other person would have to do the actual killing. Plantz said he could not help Morris.
On July 13 Morris and Plantz were in a car going to Fresno. Morris told Plantz he was going to Fresno because he had to "watch [Andrews]'s back" while Andrews killed some guy coming out of a meeting. Plantz had no intention of helping Morris with the crime, but stayed in the car. While enroute, they saw a white car headed the other way. Morris stated the car belonged to "Dave" and "there he goes." Morris made a phone call and they drove back to Riverdale where he met with Andrews at Click's home. Andrews asked Plantz to bring him Andrews's gun from the pickup truck. Plantz did as he was asked. Andrews said he had hired someone to do a killing for $100, but that the person had backed out.
The following day, Morris came to Plantz's home and stated Andrews had killed the intended victim by shooting him. Morris took out a nine-millimeter pistol, ejected a spent casing from it and stated, "Oh, there it is."
On cross-examination, Plantz admitted having an affair with Doris Morris after Morris's arrest. Plantz admitted he sold drugs and was a user of methamphetamine. Plantz testified he had never seen appellant use drugs or heard her ask anyone to kill another person.

MORRIS'S DEFENSE
Morris stated he was a seller and user of methamphetamine. He said he met Andrews via the drug business about two and one-half months before the killing. Morris described himself as the dealer and Andrews as his supplier.
About one and one-half months before the killing, Andrews introduced Morris to appellant, who was a housekeeper. Soon after, appellant began buying methamphetamine from Morris. Morris stated it was "obvious" appellant and Andrews were romantically involved.
About a week and a half before the killing, Morris heard a rumor that there was a "hit" out on somebody in Riverdale. On July 13 Andrews told Morris he might need Morris's assistance later that night when he went to Fresno to "take care" of David since Hayes had backed out. It was Morris's perception that Andrews was tired of the way David treated appellant. Morris thought Andrews's proposal to kill David was merely "bullshit," and Morris never intended to help Andrews murder David in Fresno.
Morris headed toward Fresno with Plantz, but saw David's white car pass him going the other direction. Morris paged Andrews and told him he had seen David's car leaving Fresno. Andrews told him to "cancel everything."
At 11:45 p.m. on July 13 Morris got a page from appellant, who told him Andrews wanted him to come to the Russo residence. He assumed it was to pick up some drugs. Morris went to the house about 12:10 or 12:15 a.m. Andrews handed him a gun instead of drugs and stated, "I'm going to do him now." Andrews told Moms there would be $100 in it for him if he did the actual killing. Morris declined and handed the gun back to Andrews. Appellant then took the gun from Andrews and said, "If you don't have the balls, I'll do it." Andrews took the gun from appellant, wrapped it in a towel as a silencer, and went to David's room with appellant. Morris heard a muffled shot. Someone asked whether the noise woke up the children. Andrews came out of David's room, looking very scared and "dry heaving."
Morris helped Andrews and appellant dispose of David's body and the gun. Morris felt he had no choice but to assist Andrews and appellant in disposing of the body since his fingerprints were on the gun because he had handed it back to Andrews. Morris was "shocked" and *568 "stunned" when he later learned he was being identified on television as the triggerman.
Morris admitted having lied to the police. He admitted that he was an ex-felon and that he disposed of the murder weapon by selling it to a drug dealer named Jose in exchange for two "eightballs" (i.e., an eighth of an ounce each) of methamphetamine.

ANDREWS'S DEFENSE
Andrews admitted he was a drug dealer, a methamphetamine user and a "business" acquaintance of Morris's. Andrews met appellant in January of 1994. He started using methamphetamine with her in May 1994 and he became sexually involved with her in June 1994. Appellant discussed the idea of divorcing David "a couple of times." She never discussed the idea of killing David. A week or two before July 13 appellant gave Andrews a number of David's guns. She gave Andrews the nine-millimeter pistol about four days before the killing. Appellant told Andrews David wanted the guns out of the house before someone ended up using them inside the house.
Andrews stated he introduced Hayes to appellant on July 13. Appellant and Andrews went to Hayes's house on that date before going out to lunch. Someone at Hayes's house wanted to buy a gun. Andrews and appellant said they were going to McDonald's in Fresno, and Hayes asked if he could come along. Andrews claimed he bought a stereo from Hayes and gave him $100 for it.
Andrews denied having asked Morris to come to Fresno on July 13 and "watch his back." Sometime between 11:00 p.m. and midnight on that date he got a call from appellant, who asked if he would come by and drop off some drugs. Andrews and Morris went to the Russo residence shortly after midnight and furnished appellant with drugs. Morris asked where David was. Appellant told him he was in a back room. Morris then disappeared down the hall and Andrews heard a gunshot. Appellant, who had gone to check on one of the children, asked Andrews what the sound was. Andrews replied that he did not know.
Andrews stated Morris came out of David's room with the nine-millimeter gun in his hand, pointing it at Andrews. Morris said, "Both of you come in here," and "You guys are gonna help me get rid of this," meaning David's body. Morris told Andrews and appellant to help tie David up and dispose of the body in the car. Andrews got into the car and proceeded to drive. Morris said he would follow in another car, but he never came. The car Andrews was driving ran out of gas. He got out and started running.
Andrews felt sorry for appellant and did not think she was involved in the shooting. Appellant had never asked Andrews to kill David. Andrews stated neither he nor appellant killed David.
Andrews admitted having lied to the police about his relationship with appellant, about his knowledge that David was dead, and about his whereabouts on certain dates. Andrews stated he did not know what David's insurance benefits were, and he had not discussed them with appellant. Andrews admitted that while in jail he got a letter purportedly from appellant which said, "Still going with Bobby being the trigger man." He also got a later letter from appellant in which she said Morris killed David out of jealousy, hoping to get appellant away from Andrews. Andrews received a number of letters from appellant stating she was pregnant.
Beth Breshears presented testimony to undercut Morris's credibility. Although Morris testified he had never met David, Breshears testified she saw David and Morris in Johnny Kincaid's garage in June of 1994. David was inquiring about automotive repairs. Breshears said she believed she heard Morris speak to David, *569 but was not sure about that. Breshears thought Morris knew who David was.

APPELLANT'S DEFENSE
Stephen Stone, an insurance agent, stated he was asked by appellant in December 1993 to take out a $50,000 life insurance policy on herself. The beneficiary on the policy was David.

DISCUSSION
1.-2.[**]

3. The court's failure to give a unanimity instruction on the conspiracy charge was harmless error.
Appellant was charged in count two of the information with conspiring to murder her husband. Count two also alleged that in furtherance of the conspiracy, 10 overt acts were committed:
(1) Morris asked Plantz if he knew anyone who would kill David.
(2) Appellant gave Andrews a nine-millimeter pistol which belonged to David.
(3) On July 13 Andrews and appellant asked Hayes to help them kill David.
(4) On July 13 appellant told Hayes she would pay him whatever he wanted if he helped kill David.
(5) Andrews thereafter gave Hayes $100.
(6) On the night of July 13 appellant contacted Andrews after David had gone to sleep.
(7) Morris and Andrews then went to the Russo residence.
(8) Appellant let Morris and Andrews in the residence.
(9) Appellant allowed Morris and Andrews to enter David's bedroom.
(10) Morris, Andrews and appellant shot David with the nine-millimeter pistol, killing him.
In his closing remarks to the jury, the prosecutor said the following about the conspiracy charge and the overt acts:
"The second charge is conspiracy to commit murder. `Conspiracy,' you'll learn, is an agreement between two or more people with the specific intent ... to agree to commit murder and a specific intent to commit murder, and that an overt act be done in furtherance. What's an `overt act'? An overt act is an act done in furtherance of a conspiracy, which is more than mere planning.
"We've alleged ten overt acts. I won't read them all through to you. I'll mention a couple. For example, on July 13th, Jason [Andrews] and [appellant] asked Travis Hayes to assist them in the murder of David Russo, watch his back, drive the car and so forth. [Appellant] providing the gun to Jason [Andrews] and all those.
"In order to find the defendants guilty of conspiracy to commit murder, you have to find these elements to be true, and you have to find at least one overt act. You need not unanimously agree, however, which act is true. Some of you may say, yeah, I think that overt act number one, she gave him the gun, is true. Others may say, well, I think themasking Jasonstrike thatasking Travis [Hayes] to assist is true. Some of you may disagree. But if you all unanimously agree that there's one act, overt act, then you're there.
"When you go through the overt acts listed some of them will mention, for example, [appellant] giving Jason [Andrews] the gun, others, [appellant] and Jason [Andrews] talked to Travis Hayes about helping. Some mention Bobby Morris. Just because a co-conspirator is not listed in the overt act does not mean it's not attributable to him. If you find that these defendants are involved in a conspiracy, any overt act that has been committed is attributed to the other.

*570 "I think sometimes that I suspect that when school teachers get up to go to work they say to themselves if there's just one thing I got to get across to my students today it's this. Well, I'm not a teacher, but if there's one thing I'd get across to youactually there's two thingsit would be this: You don't need to unanimously agree on the overt act as long as you all feel there is one; and, secondly, that the overt acts of co-conspirators are attributable to all in the conspiracy. Don't want you to be misled when going through these ... well, gee, Bobby Morris is only mentioned in two or three of these. If you find that all of these acts allegedif you find them to be true are attributable as well to Bobby Morris.
"An overt act does not have to be an attempt. It does not have to be criminal in nature. It's anything done in furtherance of the conspiracy."
The court did not instruct the jurors that a unanimous agreement was required on at least one overt act. Prior to instructing the jury, the court made a statement to the attorneys: "[A]U jurors have to find at least one overt act to be true, and they don't all have to agree as to what that overt act is."
Appellant contends the trial court incorrectly interpreted the law in not giving a unanimity instruction as to the conspiracy charge. She further argues that because of the nature of the overt acts alleged and the evidence presented, no juror could have found appellant conspired to kill her husband without simultaneously finding at least one of her codefendants also did so. However, because the jury deadlocked on the conspiracy charge on Andrews and Morris, the jurors could not have agreed unanimously upon any overt act. We are not persuaded.
CALJIC No. 17.01 is the standard instruction regarding the principle of jury unanimity. It provides in its entirety:
"The defendant is accused of having committed the crime of ____ [in Count ____]. The prosecution has introduced evidence for the purpose of showing that there is more than one [act] [or] [omission] upon which a conviction [on Count ____] may be based. Defendant may be found guilty if the proof shows beyond a reasonable doubt that [he] [she] committed any one or more of the [acts] [or] [omissions]. However, in order to return a verdict of guilty [to Count ____], all jurors must agree that [he] [she] committed the same [act] [or] [omission] [or] [acts] [or] [omissions]. It is not necessary that the particular [act] [or] [omission] agreed upon be stated in your verdict."
The Use Note for this instruction acknowledges a conflict of authority as to whether it is required to be given as to the finding of an overt act in conspiracy cases. It provides that if the trial court concludes that it should be given in such cases, the word "overt" is to be inserted before "act" and the word "omissions" should be deleted wherever found. (Use Note to CALJIC 17.01 (6th ed.1997) p. 563.)
Several cases hold that unanimity is not required on a single "overt act" to support a conspiracy conviction because the agreement constitutes a punishable conspiracy. The overt act is part of the theory of the case, not an act constituting the offense. For this reason, the giving of CALJIC No. 17.01 is not required in a conspiracy case. (See, e.g., People v. Jones (1986) 180 Cal.App.3d 509, 516, 225 Cal.Rptr. 697; People v. Cribas (1991) 231 Cal.App.3d 596, 611-612, 282 Cal.Rptr. 538; People v. Godinez (1993) 17 Cal. App.4th 1363, 1367, 22 Cal.Rptr.2d 164; People v. Von Villas (1992) 11 Cal.App.4th 175, 233-235, 15 Cal.Rptr.2d 112.)
People v. Jones, supra, was the first to tackle the question of whether the trial court should have instructed the jury sua sponte that it was required to agree upon the overt act committed in furtherance of the conspiracy (CALJIC No. 17.01). The defendant in Jones was convicted of kidnapping, *571 robbery and conspiracy to commit robbery. (180 Cal.App.3d at p. 511, 225 Cal.Rptr. 697.) Jones found no error, explaining as follows:
"Where a defendant is prosecuted for violation of a statute under which any of several different acts would constitute the offense, the jury must be instructed they must agree on at least one of the acts committed by the defendant which constitutes the offense. [Citations.] However, the jury need not agree on the `theory' of the crime, the reason why the act is unlawful. [Citation.] Thus, for example, where a defendant is charged with burglary, which requires an unlawful entry with the intent to commit a felony or theft, the jurors need only be unanimous in finding that a felonious entry took place, not the particular felony intended. [Citation.]
"In the case of conspiracy, Penal Code section 182 provides: `If two or more persons conspire: [¶] 1. To commit any crime .... They are punishable [by one of the listed punishments.]' Section 184 provides: `No agreement amounts to a conspiracy, unless some act, beside such agreement, be done within this state to effect the object thereof, by one or more of the parties to such agreement....'
"The elements of conspiracy are most often defined as (1) an agreement to commit a crime, and (2) an overt act done in furtherance of the agreement. [Citations.] While the overt act is considered an element of the crime, it need not be committed by the defendant, but may be committed by any of the conspirators [citations] and it need not be criminal in nature, so long as it is done in pursuit of the conspiracy [citations].
"The purpose of the overt act requirement is to allow the conspirators the opportunity to reconsider their agreement and terminate it to avoid punishment for conspiracy. [Citations.] The overt act also must be proved `in order to show that an indictable conspiracy exists,' in that `evil thoughts alone cannot constitute a criminal offense.' [Citation.]
"There are cases, however, which specify it is the agreement itself which constitutes a punishable conspiracy; the overt act merely establishes the legal existence of a criminal conspiracy. [Citations.] This conclusion is logical in light of the stated purposes for requiring the overt act: allowing termination of the agreement to avoid punishment and requiring proof of an intent to act on the evil thoughts harbored by the conspirators. It also is logical in light of the Penal Code, which in section 182 provides punishment for conspiracy and in section 184 provides an agreement amounts to a conspiracy when the overt act is done. Thus, People v. George (1968) 257 Cal.App.2d 805, 808, 65 Cal. Rptr. 368 ... concludes: `In a conspiracy, the agreement to commit an unlawful act is not criminal until an overt act is committed, but when this happens and the association becomes an active force, it is the agreement, not the overt act, which is punishable .... [Citations.]' (Italics original.)
"Inasmuch as the overt act, though required to establish the existence of a conspiracy, is not an actual element of the crime, it follows that the jury only need be unanimous in finding an overt act was done in furtherance of the conspiracy, not in finding a particular overt act was done. [Citation.] Inasmuch as the overt act need not actually be illegal or committed by the defendant, it is not a specific act committed by the defendant as to which the jury must agree. [Citation.] Hence, the overt act is part of the `theory' of the case, not an act constituting the offense. [Citation.] For the foregoing reasons, we hold a trial court need not instruct the jury they must unanimously agree as to the overt act done in pursuance of a conspiracy...." (People v. Jones, supra, 180 Cal. App.3d at pp. 515-517, 225 Cal.Rptr. 697.)
*572 A number of other cases have followed the reasoning in Jones. People v. Cribas, supra, involved a defendant convicted of rape, bribery of witnesses and conspiring with his brother to bribe witnesses. (231 Cal.App.3d at p. 599, 282 Cal.Rptr. 538.) The defendant objected to the trial court's failure to instruct, sua sponte, pursuant to CALJIC No. 17.01, that the jury had to agree unanimously on the overt act or acts underlying the conspiracy charge. The court in Cribas relied on the reasoning set forth in Jones, supra, and determined that a specific unanimity instruction on overt acts was not required. (People v. Cribas, supra, at p. 611, 282 Cal.Rptr. 538.) The court further stated,
"CALJIC Nos. 6.10 and 17.50 sufficiently apprised the jury of its duties. CALJIC No. 6.10 told the jury that proof of a conspiracy requires proof of at least one overt act. CALJIC No. 17.50 advised that all 12 jurors had to agree on a decision and to any findings in their verdict. `These most specific instructions must be viewed in conjunction with the unqualified requirements that proof be made beyond a reasonable doubt as to each element of an offense and that the verdict be unanimous. There is no inadequacy in the instruction given.' (People v. Skelton (1980) 109 Cal.App.3d 691, 717, 167 Cal.Rptr. 636....)" (People v. Cribas, supra, 231 Cal.App.3d at p. 612, 282 Cal.Rptr. 538.)
In People v. Godinez, supra, the defendant was found guilty of attempted murder and conspiracy to commit murder. The defendant claimed his conspiracy conviction should have been reversed because the trial court refused to instruct the jurors that they must unanimously agree on at least one overt act. The court in Godinez disagreed, relying upon the reasoning in Jones. (People v. Godinez, supra, 17 Cal.App.4th at p. 1367, 22 Cal.Rptr.2d 164.)
The court in Godinez also noted that even if the unanimity instruction were required, by finding the defendant guilty of attempted murder, as charged in the information, and guilty of conspiracy, the jurors must have been unanimous at least as to the commission of overt act No. 6. The information charged that on January 19, 1989, the defendant attempted to murder four named individuals. Overt act No. 6 was that on January 19, 1989, the defendant and other unnamed conspirators attempted to kill these same named individuals. (People v. Godinez, supra, 17 Cal. App.4th at p. 1367, 22 Cal.Rptr.2d 164.)
In People v. Von Villas, supra, the defendant was convicted of murder and conspiracy to commit murder. (11 Cal. App.4th at p. 190, 15 Cal.Rptr.2d 112.) The defendant argued the trial court erred when it complied with Jones and refused to instruct the jury to unanimously agree upon the same overt acts committed in furtherance of the conspiracy before finding guilt. The defendant argued that since the commission of an overt act was an essential element of conspiracy, the failure to give such an instruction was error. (11 Cal.App.4th at pp. 233-234, 15 Cal.Rptr.2d 112.)
As explained in Von Villas, "An overt act of a conspiracy has been held to be part of the `theory' of the case rather than an actual element of conspiracy [citations]." (11 Cal.App.4th at p. 234, 15 Cal. Rptr.2d 112.) According to Von Villas, this distinction is significant because it is not necessary to require the jury to agree on one or more of the several theories presented by the prosecution. Rather, it is sufficient that each juror is convinced beyond a reasonable doubt that the defendant is guilty of the offense. (Ibid.)
There is, however, contrary authority which, in dicta, indicates that an overt act is subject to the unanimity requirement, based on the understanding that an overt act is an element of conspiracy. (People v. Cribas, supra, 231 Cal.App.3d at pp. 611-612, 282 Cal.Rptr. 538; People v. Ramirez (1987) 189 Cal.App.3d 603, 611-615, 236 Cal.Rptr. 404; People v. Brown (1991) 226 Cal.App.3d 1361, 1369, 277 Cal.Rptr. 309.) *573 This court's decision in People v. Brown, supra, is relied on by appellant and mentioned in several cases as one which supports the contrary view of that expressed in Jones et al.
In People v. Ramirez, supra, 189 Cal. App.3d 603, 236 Cal.Rptr. 404, the defendants argued their conspiracy convictions should be reversed because the jury was not instructed that it was required to unanimously agree upon which overt act was committed in furtherance of the conspiracy. The court in Ramirez relied upon this court's decision in Feagles v. Superior Court (1970) 11 Cal.App.3d 735, 739, 90 Cal.Rptr. 197, in which we held that the commission of an overt act was an essential element of conspiracy. While making no mention of the decision in Jones, the court in Ramirez ultimately found that any failure to give the unanimity instruction under the facts of the case was harmless. (People v. Ramirez, supra, 189 Cal.App.3d at pp. 611, 613-615, 236 Cal.Rptr. 404.)
In Ramirez, CALJIC Nos. 6.10 and 17.50 were given. The defendants alleged these instructions left room for jurors to convict although disagreeing which overt act was committed in furtherance of the conspiracy, and that an instruction like CALJIC No. 17.01, specifically directing unanimity on the overt act element, should have been given sua sponte. (People v. Ramirez, supra, 189 Cal.App.3d at p. 612, 236 Cal.Rptr. 404.)
Although the court reasoned that it was not apparent why jurors would be any more likely to infer the unanimity requirement in the context of overt acts underlying a conspiracy conviction, it was not prepared to agree with People v. Skelton (1980) 109 Cal.App.3d 691, 715-717, 167 Cal.Rptr. 636, that other instructions adequately covered the issue. But the court also reasoned that the absence of an instruction like CALJIC No. 17.01 did not undermine the verdict in every case. Where there was no possibility of juror disagreement, the specific instruction may not be required (People v. Gonzalez (1983) 141 Cal.App.3d 786, 791, 190 Cal.Rptr. 554 [conviction for rape; two acts within minutes of each other and with nothing to allow the jury to accept the defense of consent as to only one]), or, at least, its absence will be deemed harmless error (People v. Deletto (1983) 147 Cal.App.3d 458, 471-472, 195 Cal.Rptr. 233 [conviction for oral copulation with no basis in evidence to distinguish between two acts]). (People v. Ramirez, supra, 189 Cal.App.3d at p. 613, 236 Cal.Rptr. 404.)
The possibility of disagreement exists when the defendant is accused of a number of unrelated incidents, leaving jurors free to believe different parts of the testimony and yet convict the defendant. (People v. Castro (1901) 133 Cal. 11, 12-13, 65 P. 13 [defendant charged with one act of unlawful sexual intercourse, but victim testified to four separate acts over a period of several months].) Disagreement may also exist when the defendant offers a defense which could be accepted or rejected as to some but not all of the acts. However, when the jury could accept or reject a defense in toto, the unanimity instruction is unnecessary. (People v. Gonzalez, supra, 141 Cal.App.3d at p. 792, 190 Cal.Rptr. 554.)
In Ramirez, the defendants were convicted of, inter alia, attempted murder and conspiracy to commit first degree murder. The evidence consisted of testimony of both victims. The evidence supporting each act was the same. Therefore, there was no basis for the jury to conclude that some but not all of the acts took place. (People v. Ramirez, supra, 189 Cal.App.3d at p. 613, 236 Cal.Rptr. 404.)
In Brown, the question was not whether the unanimity instruction should have been given on the overt acts alleged in the conspiracy charge. Rather, in Brown, we addressed the question of whether there was sufficient evidence to support the conspiracy conviction because the only overt act found to be true was committed subsequent to the robbery. (People v. Brown, *574 supra, 226 Cal.App.3d at p. 1367, 277 Cal. Rptr. 309.) Three overt acts were alleged. The overt acts which the jury did not find to be true were (1) that one coconspirator drove the other coconspirators to the victim's location for purpose of robbing him and (2) that one coconspirator obtained a bat and took it with him to the scene of the crime. The only overt act which the jury found true was that the three defendants shared in the proceeds of the robbery in furtherance of the conspiracy. (Ibid.)
Our reasoning in Brown was twofold. First, we reiterated that the great weight of authority holds that the elements of conspiracy are: (1) an agreement to commit a crime, and (2) an overt act done by a member of the conspiracy in furtherance of the agreement. (§ 184; People v. Brown, supra, 226 Cal.App.3d at p. 1367, 277 Cal. Rptr. 309 and cases mentioned therein.) Second, we relied upon our Supreme Court's decision in People v. Zamora (1976) 18 Cal.3d 538, 134 Cal.Rptr. 784, 557 P.2d 75 and determined that the overt act was committed by conspirators subsequent to the completion of the crime which was the primary object of a conspiracy and could not be deemed to be an overt act in furtherance of that conspiracy. (People v. Brown, supra, at p. 1368, 277 Cal.Rptr. 309.)
Our decision in Brown makes no mention of Ramirez at all. As to Jones, we stated the following:
"We also reject respondent's contention that the overt act requirement is not an element of the crime of conspiracy and thus the conviction may be sustained irrespective of the jury's finding, or more appropriately, nonfinding. Respondent cites People v. Jones (1986) 180 Cal.App.3d 509, 516, 225 Cal.Rptr. 697 ... to support this contention but does little more than raise the issue by citing Jones. Respondent does not explain how adopting Jones would assist its position. In any event, this court has already determined that an overt act is an essential element in the crime of conspiracy. (Feagles v. Superior Court, supra, 11 Cal.App.3d at p. 739, 90 Cal. Rptr. 197.)" (People v. Brown, supra, 226 Cal.App.3d at p. 1369, 277 Cal.Rptr. 309.)
The split of authority as to whether, in a prosecution for criminal conspiracy, the jurors be instructed that they must unanimously agree on the same overt act or acts in order to convict a defendant of conspiracy was recognized but not resolved by the Supreme Court in People v. Jackson (1996) 13 Cal.4th 1164, 1227, footnote 15, 56 Cal. Rptr.2d 49, 920 P.2d 1254.
We stand by our reasoning in Brown that an overt act requirement is an element of the crime of conspiracy. While that reasoning leads to the conclusion that the jury should have been given a unanimity instruction on the overt act element, we further conclude that failure to give the instruction was harmless error.
The facts here are similar to those in Ramirez and Godinez where the evidence supporting the murder and conspiracy to commit murder convictions was the same.[3] The jury convicted appellant of first degree murder with the special circumstance of killing the victim while lying in wait. There was no evidence presented that appellant herself killed David. Instead, Morris and Andrews each testified that the other fired the fatal shot. Each also testified that appellant let them into her home on the night in question (overt act No. 8) and allowed them to enter David's bedroom (overt act No. 9). In her statement to Detective Moore appellant admitted doing so. There was no contrary evidence.
*575 In order to find that appellant was guilty of the lying-in-wait special circumstance, the jury necessarily found that one or both of overt acts 8 and 9 were committed. Since there was no realistic possibility of disagreement among the jurors as to the fact or characterization of at least these two overt acts, any error in failure to give a specific unanimity instruction was harmless. (People v. Ramirez, supra 189 Cal.App.3d at pp. 614-615, 236 Cal.Rptr. 404.)
4.-5.[***]

DISPOSITION
The judgment is modified by ordering that execution of the sentence imposed on count two is stayed pursuant to Penal Code section 654, and as so modified the judgment is affirmed. The superior court shall issue an amended abstract of judgment reflecting the modification and shall transmit a certified copy thereof to the appropriate authorities. The petition for writ of habeas corpus is denied.
ARDAIZ, P.J., and HARRIS, J., concur.
NOTES
[*] Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts 1, 2, 4, and 5 of Discussion.
[1] All further statutory references are to the Penal Code unless otherwise stated.
[2] Unless specified otherwise, all further references to dates are to 1994.
[**] See footnote *, ante.
[3] CALJIC Nos. 6.10 and 17.50 were given in the instant case, as in Ramirez and Cribas. The verdict form signed by the jury fore-person on the conspiracy count for appellant stated, "We further unanimously agree that at least one (1) overt act was committed." The clerk read the verdict form, including this wording, and the jury was polled as to the accuracy of the verdict.
[***] See footnote *, ante.